## THE CITY OF DUNKIRK.

(District Court, S. D. New York. December 30, 1925.)

**1. Shipping �ején132(5)—Evidence held to show that tank in which cocoanut oil was shipped was not liquid-tight.**

In libel to recover for short delivery and damage to shipment of cocoanut oil, evidence *held* to show that tank in which oil was shipped was not liquid-tight, and that if cement applied to rivets had made it tight it did not continue in that condition.

**2. Shipping ⟵101, 141(1)—Vessel held common carrier subject to statute prohibiting covenants in bill of lading relieving owner from exercise of due diligence and obligation to make vessel seaworthy.**

Where vessel was a general ship taking cargo from various points from various shippers, issuing bills of lading to the several shippers, her movements being entirely in owner's control, *held*, vessel was common and not special carrier, and was therefore subject to provisions of Harter Act, § 2 (Comp. St. § 8030), making it unlawful for owner of vessel to insert covenants in bill of lading relieving owner from exercise of due diligence and obligation to make vessel seaworthy and to properly handle and stow cargo.

**3. Shipping ⟵121(2)—Where tank leaked, allowing cargo of cocoanut oil to escape, vessel was unseaworthy in such respect.**

In a libel for short delivery and damage to shipment of cocoanut oil, where it could not be disputed that loss and damage was due to leakage of tank in which it was shipped, the vessel was unseaworthy in such respect.

**4. Shipping ⬅121(2)—Test of "seaworthiness" stated.**

The test of "seaworthiness" of a vessel is whether vessel is reasonably fit to carry cargo which she has undertaken to transport.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Seaworthy—Seaworthiness.]

**5. Shipping ⬅121(1)—Patching leak in tank with cement held not exercise of due diligence to make tank seaworthy.**

In libel for short delivery and damage to shipment of cocoanut oil, *held*, that patching with cement of leak in tank in which oil was shipped was not use of due diligence to make the tank seaworthy, in view of fact that severe storms on long voyage were likely to be encountered.

**6. Evidence ⬅75—Failure of steamship company to produce witnesses to testify as to appearance and condition of tank rivets or rivets themselves raised presumption against owner.**

In libel for short delivery and damage to shipment of cocoanut oil caused by leakage of ship's tank, where libelant contended that loss was caused by unseaworthy condition of tank, *held*, that failure of steamship company to produce witnesses to testify as to appearance and condition of rivets on repair of tank, or to produce rivets themselves, raised presumption against owner.

**7. Shipping ⬅141(3)—"Peril of the sea" defined.**

A "peril of the sea" means something so catastrophic as to triumph over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port in safety.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Perils of the Sea.]

**8. Shipping ⬅141(3)—Damage to shipment of cargo of cocoanut oil caused by leakage of tank held not due to peril of sea.**

In a libel for short delivery and damage to cargo of cocoanut oil caused by leakage of tank in which it was shipped, *held*, that damage was not due to peril of the sea.

In Admiralty. Libel by W. F. Stevenson & Co., Limited, against the Steamship City of Dunkirk; T. O. Sanborne, claimant. Decree for libelant.

Taft & Sherman, of New York City (Burlingham, Veeder, Masten & Fearey and John L. Galey, all of New York City, of counsel), for libelant.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (L. de Grove Potter, of New York City, of counsel), for claimant.

WINSLOW, District Judge. This action is brought to recover for short delivery and damage on a shipment of cocoanut oil carried on the steamship City of Dunkirk from Manila, to the city of New York, October, 1920, to January, 1921, and to recover special expenses incurred by the libelant by reason of delivery of a portion of the oil in a damaged condition and in part solidified.

The defenses set up in the amended answer are, in substance, that the loss was caused by perils of the sea, a cause excepted in the bill of lading; that any defects in the hull or unseaworthiness of the vessel at the beginning of the voyage were also excepted from the bill of lading; that the vessel was excused by the exception in the bill of lading as to leakage.

A quantity of cocoanut oil was delivered to the vessel at Manila, in bulk, in October, 1920, for transshipment to New York, in accordance with the terms of the bill of lading issued therefor.

The libelant contends that the vessel was a common carrier of goods, for hire. The claimant contends that as to this libelant the vessel was a special carrier. The cocoanut oil was pumped by the shipper into the deep tank of the ship in a compartment supposed to be liquid-tight, situated aft of the engine room. Underneath this deep tank was a double bottom tank, a compartment about 3 feet 6 inches in depth, in which fuel oil, or water ballast, was carried. Above the deep tank was a compartment used for miscellaneous cargo, and above that the bridge deck space, also used for miscellaneous cargo. After taking on the oil, the vessel loaded further cargo at Manila and proceeded to Singapore, where she took on other cargo, consisting of rubber, flour, etc. Proceeding via Suez Canal, she arrived at Boston, December 10, and New York, December 17, 1920. On January 7, 1921, the vessel proceeded to Bayway, N. J., to discharge the oil cargo.

At the time the loading of the oil cargo was completed, the tank was substantially full, or within six inches of the lid in the neck or trunk of the tank. On removal of the hatch, at the time of discharge at Bayway, N. J., the cocoanut oil was two feet below the tank top on the port side of the vessel, and about eighteen inches below on the starboard side; the vessel then having a slight list. Cocoanut oil hardens at a temperature of about 73 degrees F. The oil was liquid when leaving the warm climate at the point of shipment. It liquifies above 76 degrees F., so that it was necessary, on arrival in the cold temperature of New York, in December, to provide steam coils about the tank for discharging it. These coils were in place.

It is in evidence that, in order to liquify the oil in midwinter, the coils should be heated approximately 48 hours before discharge begins. Seasonable notice of this was given to the steamship agents, but it is in evidence that the coils were not heated until the day before January 7th, when .the discharge began. The oil was not at this time completely liquified, and the consignees refused to receive the oil until the master had agreed that, if the pumping was started, it would be without responsibility on the part of the receiver for delay on account of inability to discharge the cargo in full, to which agreement the master is said to have agreed. So much of the oil as was liquid was poured into the tanks of the consignee, or its agents; but there was still a large quantity of the solidified oil on the sides of the tank. Seventy-one barrels of the solid oil was discharged at Bayway, but the remainder of it remained in the vessel, which, on the morning of January 9th, proceeded to Bush Terminal in Brooklyn, to load cargo for another voyage. Thereafter, after proceeding to Philadelphia, the ship returned about January 24th and made further delivery. Some 122 barrels and 111 bags of damaged oil, contaminated with fuel oil, were delivered to libelant's agents, by lighter.

It appears that the deep tank was tested at Manila with water. Some leaks .were found at certain rivets. Patches of cement were put over the leaks and, after the cement was hardened, the tank was, apparently, found to be water-tight. Thereupon the oil was loaded. While crossing the Atlantic, one of the assistant engineers had occasion to go to the double bottom below the deep tank, and there discovered cocoanut ·oil leaking through at the rivets in the bottom into the fuel oil tank. Wooden braces, or supports, were placed below the bottom. rivets, as far as possible, to stop the leaks. This tank beneath the deep tank, where the oil was, had contained fuel oil at the beginning of the voyage. At the time of the examination by the assistant engineer, this fuel tank was empty. The colder temperature on the Atlantic undoubtedly stopped further leakage as the vessel proceeded.

[1] There can be no doubt from the evidence that the tank was not liquid-tight, and, assuming that the cement applied to the rivets had made it so for the time being, it did not continue in that condition. The record convinces me that the weather encountered was not of itself sufficient to cause the tank to leak, except as it may have displaced the cement covering which could not have been adequate, and the voyage possibly affected other defective rivets.

The claimant, however, insists that the ship was not a common carrier as to this particular shipper, but that she was a private carrier, and therefore the various exceptions of the bill of lading had the effect of absolutely relieving the vessel not only of its warranty of seaworthiness, but also from the duty of due care to provide a seaworthy vessel, and also relieved it from liability for its alleged negligence in the care and custody of the cargo. This particular contention was set up in the amended answer some three years after suit was begun.

[2] Section 2 of the Harter Act (Comp. St. § 8030), it seems to me, is peculiarly applicable, which makes it unlawful for the owner of the vessel to insert in any bill of lading any agreement or covenant relieving the owner of the vessel from the exercise of due diligence and the obligation to make the vessel .seaworthy and capable of performing her intended voyage and properly handling and stowing her cargo. I see no ground whatever for holding, on the evidence, that the vessel was other than' a common carrier. The case is very different from a case where the whole vessel is chartered. The City of Dunkirk was a general ship taking cargo at various points from various shippers and issuing bills of lading to the several shippers. Her movements were entirely in the control of her owners. The contract sued on in the instant case is the bill of lading, and not the charter party. We are here dealing with an ordinary negotiable bill of lading, which is the contract of carriage and within the express terms of section 2 of the Harter Act. The holder of the bill of lading for the goods loaded on this general ship does not have the run of the whole ship and is not in a position to determine her seaworthiness.

[3-6] It cannot be disputed that the loss and damage to the cocoanut oil was due to leakage from the tank, and in that respect the vessel was unseaworthy. The test of unseaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport, and I think that this warranty is an absolute one. Even if it were qualified, I do not believe the evidence in this case justifies the conclusion that due diligence was used to make the tank seaworthy. The danger of a long sea voyage covering a ' period of several months, at a time of year when severe storms of the Atlantic were likely to be encountered, required more than was

done in this case by patching with cement. Indeed, I seriously question whether a proper inspection of the deep tank was made from beneath, either when it was tested with water, or later, after the cocoanut oil was loaded. The leak itself would seem to contradict the probability of such inspection, for the double bottom tank underneath the deep tank was full at the time the deep tank was filled with water for testing purposes. After the arrival of the vessel at New York, one of the witnesses examined the tank at the bottom, but it was still covered with a mass of solidified cocoanut oil, and later on, when further examined, the rivets in question had been punched out. None of the employees of the steamship company who had charge of the renewal of these rivets in New York were called as witnesses to testify as to the appearance and condition of the rivets, nor were any of these rivets produced in court, although the suit was pending at the time such repairs were being made. Failure to produce these witnesses, or the rivets themselves, of itself raises a presumption against the owner.

[7, 8] A peril of the sea means something "so catastrophic as to triumph over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port in safety." The Rosalia (C. C. A.) 264 F. 285, opinion by Hough, J. The damage was not due to a peril of the sea.

While the evidence is somewhat conflicting as to whether the leakage occurred where some of the rivets had been cemented, or through other rivets in the clips attached to the gussets along the after bulkhead, I think that is relatively unimportant.

In view of the conclusions, it is unnecessary to consider the question of the alleged deviation of the vessel from the agreed voyage before the delivery of the balance of the oil.

Decree will be for the libelant in the usual form.