## AMERICAN LINSEED CO. v. UNITED STATES.

### No. 7631.

District Court, E. D. New York.

Feb. 14, 1930.

Bigham, Englar, Jones & Houston, of New York City (Oscar R. Houston and James N. Senecal, both of New York City, of counsel), for libelant.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (William E. Collins, Sp. Asst. to U. S. Atty., of New York City, of counsel), for the United States.

INCH, District Judge.

Libelant, under the Act of March 9, 1920 (46 USCA §§ 741–752), by this libel filed March 3, 1925, brings this suit against the United States to recover damages alleged to have been sustained in August, 1924.

The United States owned the steamship Anaconda, a merchant vessel, employed in the carriage of merchandise, between the ports of Rotterdam and New York. By reason of certain arrangements made by libelant, a large quantity (600 tons) of pure linseed oil, in bulk, in good order and condition, was shipped and placed on board said steamship, at Rotterdam, on or about August 15, 1924, the vessel sailing from Rotterdam August 18, and arriving at Brooklyn, N. Y., September 3, 1924.

Libelant paid approximately $104,000 for this oil. The freight paid was $4,543.14.

When this linseed oil was discharged at Philadelphia, a portion of it was found to be missing and a portion of that remaining was found to be seriously damaged by contact with sea water.

This oil had been carried in the double bottom tanks of the steamship. The fact that there were leaks sufficient to account for some loss and some damage was, in substance, conceded.

■ There seems to be no question about the jurisdiction of this court to hear the case. Johnson v. U. S. Shipping Board, 280 U. S. 320, 50 S. Ct. 118, 74 L. Ed. —— (January 6, 1930).

The Anaconda is a twin screw steamer of 9,700 tons. She is 395 feet long, 55 feet beam, with five double bottom tanks for ballast in addition to fresh-water tanks. She was a coal burner.

The Anaconda had never before carried oil in her double bottom tanks. This was known to those in charge of her, and is a circumstance not to be overlooked. The captain of the ship was not a witness.

She had been dry-docked about six months before the trip in question to repair "certain

collision and heavy weather damage," after which, according to Roberts, she had been reported seaworthy. Grace & Co. v. Panama R. Co. (C. C. A.) 285 F. 718. However, she did not necessarily have to be dry-docked before each voyage. The Sandfield (D. C.) 79 F. 371, affirmed (C. C. A.) 92 F. 663.

At Rotterdam, just before the oil was taken aboard and the voyage to New York undertaken, a leak had developed, at the junction of a vent pipe, in the double bottom tank. The water had flowed out over the tank top. This leak was repaired, according to the testimony of Chief Officer Jensen and Chief Engineer Stewart. Smith, the port engineer, says that this repair was "a workmanlike job."

The oil was then put into the tanks: Linseed oil, like other vegetable oils, is more difficult to carry than water. The Turret Crown (C. C. A.) 297 F. 766. It is thinner than water, and will gradually penetrate through rust and escape.

■ The character of this cargo therefore was of a nature requiring a corresponding degree of diligence from those accepting it and receiving the substantial freight money already referred to.

When the ship reached Philadelphia, a number of other leaks were found. There was a leak in the angle connecting the tank top, a leak in the seam in the tank top, a leak in the vent pipe on the port side of the No. 2 tank, and a leak in the shell plating of the No. 2 double bottom. There were about forty leaking rivets. Some of these were "squirting" leaks. While possibly some of these did not play a part in the loss and contamination of what is conceded to be lost and damaged oil, yet others certainly did so.

The issue therefore seems, according to the arguments of counsel in their excellent briefs, to be as follows: The libelant claims, and I think correctly, that sufficient has been shown to require the respondent to explain satisfactorily this loss and damage or submit to a decree.

The respondents contend that the proof shows due diligence on their part, and that these leaks were due to latent defects occasioned by a very rough sea voyage.

■ Seaworthiness and due diligence are questions of fact. The Capulin (D. C.) 298 F. 953.

■ The burden rested upon the respondent to prove that proper and reasonable tests, to make the ship seaworthy, had been made. If a doubt arises, the libelant should have the benefit of it. The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65.

The testimony here shows no unusually rough voyage, certainly not of extreme and unexpected violence. The Arakan (D. C.) 11 F.(2d) 791; The Rosalia (C. C. A.) 264 F. 285, 287; The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241. There is insufficient proof here that these leaks were latent and brought on by a marine peril.

The issue therefore becomes somewhat narrow. The conceded loss and damage to the oil was plainly occasioned by a leaking condition of the tanks. This condition was caused, according to libelant, by failure on the part of respondent to use due diligence, while respondent claims it did so.

What did the respondent do at Rotterdam to make the tanks safe? I have already referred to the leak that was found and repaired. While Savenije, representing the American Bureau, may have referred to a second water pressure test, it is far from clearly shown that this in fact took place. Smith, the port engineer, admitted that he saw no such subsequent test. There is nothing of this sort in the log. Stewart, the chief engineer, could throw no light on this important subject. The conditions required a clear showing of such proper preparation of the tanks, especially for oil. The doubt here should be given to libelant. The Southwark, supra.

What then did the respondent do in this repair job? When the double bottom tanks were pressed up the first and, so far as I can see, the only time, and the leak in question appeared, it would reasonably seem difficult for any one to be certain that that leak was the only one unless the ceiling of the tank was raised so that its surface could be wholly examined. This was not done.

Jensen, and Capt. Schwartz, testified "that they lifted up a board here and there." Respondent claims this was all that was necessary. The Alvena (C. C. A.) 79 F. 973.

With the conditions subsequently found at Philadelphia, I do not think this authority holds that this sort of examination is all that is required under any circumstances. That was a case of a cargo of sugar. Even there the court suggested what might be considered a "more thorough inspection" by removing the entire ceiling. Reasonable pru-

dence and diligence would seem to have required here some such inspection.

To be sure, the tanks were inspected by three surveyors. Savenije, representing the American Bureau, Capt. Schwartz, representing the underwriters, and Smith, the port engineer; but the duty to use due diligence cannot be delegated. International Co. v. Farr Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830; Bethlehem Corp. v. Gutradt (C. C. A.) 10 F.(2d) 769; The Skipsea (C. C. A.) 9 F.(2d) 887; Olsen v. U. S. Shipping Co. (C. C. A.) 213 F. 18.

The attendance of Capt. Schwartz, while some evidence, is not conclusive on libelant, nor sufficient in itself, to satisfactorily prove that due diligence was in fact used.

Libelant, under such circumstances as here, should not be estopped by the possible neglect of some one representing the underwriters. The duty to use due diligence remained that of the respondent.

Moreover, testimony is present to show that the circumstances at Rotterdam indicated the necessity of a more thorough inspection of the tanks. It was the first time that the Anaconda was carrying oil. The nature of this kind of cargo was well known. A leak had been found before the oil was put on board. A substantial freight had been paid on this valuable cargo. So far as I can see, ample time and facilities existed at Rotterdam.

Waeber, marine surveyor, acting for the Bureau Veritas, a classification like Lloyds and the International, testified that, where vegetable oils were to be carried on other ships, "we found that it was the only thing to do, to lift practically the whole ceiling off because it saved time and gave more thorough results. In other words if the ceiling was left down and an occasional plank lifted and the pressure applied and more than one leak developed why you would have to lift the ceiling anyway to get at the other leaks if there was more than one."

The expert Holmes testified in substantial accord with the above.

While a great deal of testimony has been taken by deposition and on the trial, it is my opinion that the respondent has not borne the burden of proof of showing that due, that is, the required, diligence, was exercised by it. It has failed to explain the cause of the leaks, undoubtedly present, sufficiently to avoid liability for the damage concededly sustained by libelant.

It may well be said also that on this record negligence has been shown by libelant if the conceded short delivery and damage by sea water, is considered unexplained. The Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794.

Libelant is entitled to an interlocutory decree. The extent of the damage, etc., can be shown before the Commissioner.