**JEFFERSON CHEMICAL COMPANY,
Inc., and Firemen's Fund Insurance
Company, Plaintiffs-Appellants,**

**v.**

**M/T GRENA and her owners, A/S
J. Ludwig Mowinckels Rederi,
Defendants-Appellees.**

**No. 27036.**

United States Court of Appeals
Fifth Circuit.

July 18, 1969.

Rehearing Denied Aug. 8, 1969.

Second Rehearing Denied Aug. 25, 1969.

John K. Meyer, Hinds & Meyer, Houston, Tex., for plaintiffs-appellants.

William C. Bullard, Ben L. Reynolds, Baker, Botts, Shepherd & Coates, Houston, Tex., for defendants-appellees; Royston, Rayzor & Cook, Houston, Tex., of counsel.

Before JOHN R. BROWN, Chief Judge, DYER, Circuit Judge, and HUNTER, District Judge.

DYER, Circuit Judge:

This admiralty appeal arises out of Jefferson Chemical's [1] suit against the M/T Grena, her owners, A/S J. Ludwig Mowinckels Rederi and the impleaded third party defendant Charles Martin Inspectors of Petroleum, Inc., for damages to two shipments of cargo by Jefferson on the Grena. The District Court found that there was no explanation for the salt water damage which occurred on one shipment, but that the damage on the other shipment, an increase in the iron content of the cargo, was due to the inherent characteristics of the particular cargo. Dismissing the third party complaint against Charles Martin Inspectors for lack of evidence, the District Court concluded that the cargo was shipped pursuant to a charter party rather than a contract of affreightment to which the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., would be applicable; that the bills of lading issued for the two shipments in question were nothing more than receipts for the cargo shipped; and that the exoneration clause in the contract of carriage relieved the shipowners of any liability for damage on either shipment.

We reverse. We disagree that the cargo was shipped pursuant to a charter party and hold that COGSA applied, thus nullifying the exoneration clause under 46 U.S.C.A. § 1303(8). We do, however, agree with the Trial Court's findings as to the causes of cargo damage and with the dismissal of the third party complaint against Martin for lack of evidence, the result being that the defendants-appellees, the Grena and Mowinckels, are liable to Jefferson for the salt water damage resulting from the vessel's unseaworthiness but absolved of liability for the iron increase damage resulting from the inherent nature of the cargo itself.

On April 14, 1961, Jefferson and Mowinckels entered into a contract entitled variously, by Mowinckels, as a tanker voyage charter party or a Warshipoil-voy form of charter party, The agreement concerned the shipment of various chemical products including ethylene glycol, diethylene glycol, propylene glycol and ethanolamines. Essentially, under the contract Jefferson agreed to ship on Mowinckels' ships approximately ten thousand tons of the above products per year. There was a firm agreement as to the freight rate of $8.50 per ton, demurrage of $1,500 per day, and lay time of twenty-four hours per 1,000 tons. The contract also contained a clause exonerating Mowinckels for damages not caused by lack of due diligence.[2]

The contract did not specify shipment on a particular vessel or part of a vessel but rather pledged "Mowinckels' tonnage"[3] to Jefferson on a time demand basis. The contract permitted Jefferson to utilize up to the full reach of the vessel, although it was not contemplated that Jefferson would do so during the term of the contract.[4] The

---

1. Firemen's Fund Insurance Company was substituted as party plaintiff under Rule 17(a), F.R.Civ.P., because it is the real party in interest in this subrogation action.

2. The clause read in pertinent part as follows:
   18. General Exceptions Clause.
   Neither the vessel nor the master nor owners shall be held liable for any loss of or damage or delay to the cargo or for any failure in performing hereunder arising or resulting from: * * * unseaworthiness of the vessel whether existing at the beginning of the voyage or developing during the

voyage unless caused by want of due diligence on the part of the owner to make the vessel seaworthy or to have her properly manned, equipped, and supplied * * * change in quality of the cargo * * * discoloration; contamination; deterioration * * *.

3. By ownership or charter Mowinckels operated approximately five vessels normally making calls on the U. S. Gulf Coast, the U. S. Eastern Coast, the Mediterranean and Northern Europe.

4. The agreement was for a full cargo "unless otherwise stated" but if less than a full cargo was to be carried "the com-

contract also provided for the issuance of bills of lading by the master in due course pursuant to the contract and subject to the terms and provisions thereof.

In February of 1963 the *Grena* called at Jefferson's plant in Texas, and, upon the ship's tanks having been inspected and found to be clean and suitable for loading, 3149 metric tons of ethylene glycol owned by Jefferson were loaded into tanks center 8, starboard 5 and port 3 of the *Grena*. Samples of the ethylene glycol, a clear, somewhat viscous liquid the water and chloride content of which must be kept within specified limits if the product is to remain marketable, were taken both from the shore tanks immediately prior to loading and from the ship's tanks immediately after loading. Analysis of the samples showed the product to be within the specifications published by Jefferson and in good condition.

The *Grena* departed Port Neches, Texas, called at and loaded more products of other shippers at five other Texas ports, and finally departed overseas on February 11, 1963. Immediately upon arrival of the *Grena* at Rotterdam, Holland, proper sampling and analysis was performed by experts. The ethylene glycol in the center 8 and starboard 5 tanks was found to be in good condition, within the specifications and marketable, but the ethylene glycol in the port 3 tank was found to be outside the specifications. The port 3 tank contained 959.013 metric tons of damaged and unmarketable ethylene glycol which had been contaminated due to the entry of approximately 400 gallons of sea water.

■ ■ A joint survey was held on board the vessel at Rotterdam between surveyors appointed by all interests involved. After testing of the tank tops, butterworth holes and other tank openings, the surveyors found the number 3 port wing tank to be water tight and therefore could not account for the entry of salt water or increase of chloride in the cargo. The surveyor for the cargo interests did state that the increase in chloride percentage possibly could have been caused by an intake of salt water through the air vent line of the tank, but the District Court found that the tank's air vent lines were not a reasonably probable source of entry of the salt water. The District Court thus concluded from the evidence presented that there was no reasonable explanation as to how the salt water entered to contaminate the cargo. This finding is not "clearly erroneous" and therefore we are bound by it. Rule 52, F.R.Civ.P.; McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; Roberts v. Echternach, 5 Cir. 1962, 302 F.2d 370, 373; Compania Anonima Venezolana De Nav. v. A. J. Perez Exp. Co., 5 Cir. 1962, 303 F.2d 692, 694. Damage by sea water raises a presumption of unseaworthiness, Horn v. Cia. de Navegacion Fruco, S. A., 5 Cir. 1968, 404 F.2d 422, 435; Compagnie De Navigation, etc. v. Mondial United Corp., 5 Cir. 1963, 316 F.2d 163, 169, and Mowinckels admittedly was unable to discharge its burden of explaining the contamination. Thus ended the first shipment involved here.

The second claim arose out of a shipment which was loaded at Port Neches, Texas, on May 13, 1963, and delivered to Rotterdam, Holland, on June 6, 1963. On this voyage 527.16 metric tons of propylene glycol had been loaded into starboard tank 2, 523 metric tons of diethylene glycol had been loaded into port tank 2, and 1,569 metric tons of ethylene glycol had been loaded into center tank 7.

The cargo had been sample-analyzed before and after loading as in the past, and the chemicals were loaded into clean dry tanks. Immediately upon arrival of the *Grena* at Rotterdam, proper sampling and analysis again were performed, and both the ethylene glycol in the center 7 tank and the diethylene gly-

modity and quantity should be inserted." The commodities, in fact, were named and the quantity was stated to be ap-

proximately 10,000 tons per year. The *Grena's* capacity was 20,000 tons.

col in the port 2 tank were found to be in good condition, within Jefferson's specifications and marketable. The propylene glycol in the starboard 2 tank, however, was found to be well outside the published specifications. The specifications for color and iron content published by Jefferson were not met due to the great increase in iron content, and hence the propylene glycol was unmarketable.

Both Jefferson and Mowinckels are in agreement that propylene glycol will absorb iron from unlined mild steel tank walls, and both parties knew that the starboard 2 tank had unlined mild steel construction. The evidence at trial tended to show that because of the inherent iron-increase propensities of propylene glycol it should be shipped in lined or stainless steel tanks in order to avoid its natural reaction with ordinary steel. Jefferson contended that the iron increase that occurred on the instant ill-fated voyage was due to improper preparation of the tank by Mowinckels, since on prior voyages the iron content had always stayed within specifications. The District Court, however, found that the increase in iron content was due to the nature of the cargo itself and that this was a risk Jefferson exposed itself to by not requiring shipment of this product in lined or stainless steel tanks. The finding as to the cause of the iron increase also is not "clearly erroneous". Rule 52, F.R.Civ.P.; McAllister v. United States, *supra.*

Upon consideration of the terms, conditions and extent of use of the vessel by Jefferson and the nature of Mowinckels' business in which it held itself out as a common carrier, we conclude that the contract of carriage pursuant to which the two shipments were undertaken was an ordinary contract of affreightment to which the Carriage of Goods by Sea Act is applicable, rather than a charter party. Jefferson did little more than agree to utilize some vessel supplied by Mowinckels for the shipment of cargo pursuant to an ordinary contract of common carriage.

Jefferson did not agree to employ the "entire ship", The Monarch of Nassau, 5 Cir. 1946, 155 F.2d 48, 49, or "the full capacity of the ship", Romano v. West India Fruit & Steamship Co., Inc., 5 Cir. 1945, 151 F.2d 727, 730. The essence of a charter agreement is that the charterer employs the entire ship or a substantial portion of it for a particular voyage or a particular period of time from one holding himself out as a public carrier. Gilmore & Black, The Law of Admiralty, § 4–1; Carver, Carriage of Goods by Sea 169 (6th Ed.); Poor, Charter Parties & Ocean Bills of Lading § 1 (3d Ed.). Here the contract of carriage between Jefferson and Mowinkels without question partook of these characteristics. On both voyages there were others utilizing the vessel's space for carriage. The agreement did not specify any particular vessel nor any particular space upon a vessel but rather left furnishing of a vessel within the control of Mowinckels. During the two voyages Jefferson used but ten to fifteen percent of the *Grena's* carrying capacity, and Jefferson had never shipped as much as the *Grena's* full reach in an entire year, much less a single voyage. Clearly Mowinckels held itself out as a common carrier in this case, and the Jefferson-Mowinckels agreement was a contract of carriage subject to COGSA. See 46 U.S.C.A. § 1301(b).

Concluding as we do that the contract of carriage between Jefferson and Mowinckels is governed by COGSA, it follows that the exoneration clause relied upon by Mowinckels is invalid. 46 U.S.C.A. § 1303(8). Therefore Mowinckels is liable to Jefferson for the salt water damages incurred on the first trip, the District Court having found, independently of whether or not COGSA applied or whether there was exoneration under the charter party, that the evidence failed to explain precisely how the salt water entered the vessel. Horn v. Cia de Navegacion Fruco, S.A., *supra.* Upon the same authority it is clear that Jefferson, rather than Mowinckels, must suffer the loss incurred from the in-

crease in iron content due to the inherent quality of the product. *Id.*; 46 U. S.C.A. § 1304(2) (a, m).

Having carefully read the record we agree with the District Court that there was no evidence indicating a cause of action against the third party defendant Charles Martin Inspectors. The evidence showed and the District Court found that the vessel was sufficiently clean at the time the chemicals were loaded upon the *Grena*, thus fulfilling Martin's contractual obligation to Jefferson. Indeed, Mowinckel's own witnesses agreed to this and characterized the Martin inspectors as "competent" and "good conscientious men" deserving of no criticism on either occasion.

Although it has now been determined that the defendants-appellees are liable to Jefferson for the salt water damage, the amount of that damage yet remains to be determined. The case is therefore affirmed in part, reversed in part, and remanded for further proceedings, consistent with this opinion.

Affirmed in part, reversed in part.