**The COCA COLA CO., TENCO DIVISION, Plaintiff,**

v.

**SS NORHOLT, her engines, etc., et al., Defendants.**

**No. 64 AD 721.**

United States District Court, S. D. New York.

Nov. 6, 1971.

947

Hill, Rivkins, Louis & Warburton, New York City, for plaintiff by Allan B. Lutz, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant A/S Ivarans Rederi, by M. E. DeOrchis, and Stephen C. Pascal, New York City, of counsel.

Hill, Betts & Nash, New York City, for defendant Bristol City Lines of Steamships Ltd., by Robert W. Mullen, New York City, of counsel.

NEWMAN, Judge (United States Customs Court Designated to sit as United States District Judge).

This action, involving maritime causes for breach of contract and cargo damage, was tried to the court.

Plaintiff—owner of a shipment of tea carried aboard the S.S. Norholt[1] on a voyage from Avonmouth, England to Port of Newark, New Jersey—sought recovery for damages to a number of chests of tea stained by contamination resulting from the leakage of cresylic acid from a trim tank in the No. 1 hold of the ship. The action was commenced against the vessel owner, A/S Ivarans Rederi ("hereinafter Owner") and the time charterer, Bristol City Line of Steamships Ltd. ("hereinafter Charterer").

1. The Norholt is a "dry cargo" ship "with deep tanks * * * suitable for dry or liquid cargo", with the following specifications: 5,867 gross tons; 417 feet long; beam of 62 feet; five hatches; carrying an average crew of 38, including 10 officers.

A settlement agreement was reached with the plaintiff whereby plaintiff agreed to accept $25,000. for its damages, the Owner and Charterer each advancing $12,500. That settlement agreement was formalized in an order dated June 25, 1969, which reserved for the trial court the remaining issue as to which defendant was primarily liable for the settlement fund and for the cost of defending the action. The Owner and the Charterer are before the court, each claiming that the other must bear the onus of the entire loss, and each seeking indemnity from the other for the $12,500 advanced, plus reasonable counsel fees incurred.

Certain facts are not in dispute. On December 18, 1963 at Avonmouth, England, 754 chests of tea belonging to plaintiff were loaded by the Charterer onto the Norholt for transportation to Port Newark. The entire lot of tea was stowed in No. 1 hold tween deck, along with other general cargo. A bulk cargo approximating 129 tons of cresylic acid, also loaded at Avonmouth, was stowed in the trim tank beneath No. 1 hold.[2]

Cresylic acid is a coal tar product which has a strong pungent odor of creosote or disinfectant. It appeared that cresylic acid had been carried in the same tank on three prior voyages,[3] uneventfully and without any seepage of acid or damage to the other cargo carried in the No. 1 tween deck. But it is well within the realm of possibility that the chemical properties of the cresylic acid increased the porosity of the vegetable fibre in the tank lid's "Lighthouse" gasket, thus inevitably shortening the life of that gasket.

During the transatlantic voyage in issue, the Norholt encountered heavy weather with wind forces gusting up to Force 11 on the Beaufort Scale. The vessel met heavy pounding and rolling, thereby compounding the prescription for the ensuing spoilage. When the ship arrived at Port Newark in January 1964, it was definitively ascertained that cresylic acid had leaked through the tank and damaged a portion of the tea.

There was a heavy steel gasketed lid over the cargo tank in question, secured by 42 swing bolts. Built into this lid plate was a manhole cover, also bolted and gasketed. However, although the manhole gasket was made of asbestos, the tank lid gasket was a "Lighthouse" composed of wax on vegetable fibre and inorganic filler. I am convinced from the testimony that the Lighthouse gasket was not an appropriate packing for use when coming in contact with cresylic acid—particularly so, when challenging the gods of weather during a stormy transatlantic voyage in January. Indeed, the veteran Chief Officer Roiseth testified: "This was an unusual crossing. One of the worst I have ever had * * * It was impossible [at times] to open up the hatches [for inspection] because we were shipping green seas * * * over the forecastle head and Number One and Number Two hatch".

Owner claims that it was the Charterer's responsibility under the charter party to furnish any special equipment as required if any unusual cargo would be carried. On the other hand, Charterer insists cresylic acid was not an unusual cargo; and that it was the vessel's officers, not the shippers, who were obligated to provide and maintain a seaworthy tank for the cresylic acid and that they failed to do so.

■ The charter party specifically provided that Owner warranted that the vessel's deep tanks were suitable for dry or liquid cargo. A vessel owner gives an implied warranty of seaworthiness of the chartered vessel at the commencement of every voyage. Horn v. Cia de Navegacion Fruco, S. A., 404 F.2d 422 (5th Cir. 1968), cert. den., 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969); The Caledonia, 157 U.S. 124, 15 S.Ct.

2. The trim tank was used previously for carrying water ballast or dry cargo.

3. West-bound voyages commencing June 26, 1963; August 22, 1963; and October 16, 1963.

537, 39 L.Ed. 644 (1895). The owners must provide a vessel with equipment and tanks to safely store and transport the various cargoes, or the warranty has been breached. The Agwimoon, 24 F.2d 864 (D.C.Md.1928); Columbus Company v. Shore, 276 F.2d 93 (5th Cir. 1960).

▉ Prima facie, a leaking tank constitutes unseaworthiness. Artemis Maritime Co. Inc. v. Southwestern Sugar & Molasses Co., Inc., 189 F.2d 488 (4th Cir. 1951); Jefferson Chemical Co. v. Grena, 413 F.2d 864 (5th Cir. 1969). See also, American Linseed Co. v. United States, 40 F.2d 657 (E.D.N.Y.1930); City of Dunkirk, 10 F.2d 609 (S.D.N.Y. 1925). Unquestionably, the vessel owners in the instant case agreed to carry the cargo, knowing it was a corrosive liquid, and knowing that a secure tank was necessary to transport that cargo safely. The obligation of the Owner was breached under the facts here, when the tank leaked from the lid. Consequently, in providing a defective tank for the carriage of the acid there was a breach of the Owner's duty to provide a seaworthy ship, and that breach contributed to the resulting damage to the tea cargo.

Moreover, the record shows a failure by the Owner to adequately inspect and test for integrity of the tank. Thus, Chief Officer Roiseth admitted that although the manhole cover gasket "was examined every time the cresylic acid was loaded and discharged", significantly, "the gasket on the tank top was never inspected after the ship started carrying cresylic acid".

And Chief Officer Roiseth—admittedly not familiar with gaskets—mislead the shipper's representative:[4] "I did say I believe it [the gasket] was made of asbestos and tallow. It was really made of hemp and tallow"; additionally, Roiseth inaccurately stated to the Charterer's representative: "I told him I assumed it was asbestos".

Captain Stockman, a marine consultant testifying as an expert witness for the Owner, conceded: "I don't think I would carry cresylic acid with a hemp gasket on the cover"; furthermore, even if he [Stockman] transported cresylic acid with an asbestos gasket, he would "check it more often than if [he] were carrying water."

▉ The Owner cannot relieve itself from liability by shifting responsibility for the defective gasket upon the Charterer on the basis that the charter party required that the Charterers were to provide "fittings requisite for a special trade or unusual cargo". There was no proof adduced to the effect that the cresylic acid was a "special cargo". It is axiomatic that every cargo has its own special characteristics and presents its own problems of ocean carriage; and the responsibility of the Owner to supply a secure tank for the cresylic acid cannot be shifted in this case solely on the basis of the nature of this cargo.

But imposing responsibility upon the Owner for the leaking tank does not end the matter. I have concluded that the acts of the Charterer contributed equally to the cause of the resulting damage to the plaintiff's tea. Understandably, the dictates of vigorous advocacy have channeled the arguments of respective counsel to prove that one or the other litigant is responsible for the entire loss. Each party attempted to reconstruct the events in a light most favorable to itself. Hence, neither side has addressed itself to the plausible conclusion that the concurrent acts of the parties were ultimately the proximate cause of the loss, and hence by reason of such concurrent acts of negligence each must contribute equally to the payment of damages. I am clear that the Owner and the Charterer were equally at fault, and that the contamination was the result of mutual wrongdoing, each contributing to the end result, where the acts of one alone might not have been sufficient to cause any of the damages.

There was testimony that, before a voyage, a representative of the Charter-

---

4. Mr. Humphrey of Midland Tar Company.

er would prepare a preliminary cargo plan which would then be shown to the Chief Officer of the Norholt who, based on tonnage, would gauge the stability and seaworthiness of the ship and make any necessary changes in stowage to that end. Before the voyage in question Captains King and Eames, representatives of the Charterer, prepared such a preliminary plan indicating that tea was to be stowed in the No. 1 hatch. King and Eames were thereafter told by the Master of the Norholt that since tea tended to absorb odors readily, it would be better judgment to stow the tea in the No. 5 hatch. And evidently, King and Eames agreed.

Nevertheless, on the morning when the loading began Chief Officer Roiseth noted that, contrary to the Master's suggestion, the stevedores employed by the Charterer were stowing the tea in the No. 1 hatch. When the Chief Officer protested to Eames, the latter explained he had directed that the tea be stowed in the No. 1 hatch because the stevedoring gang for No. 5 was busy, while the No. 1 gang, which was to be paid in any event, was idle. The end result was a determination by the Charterer to leave the tea in the No. 1 hatch; while plainly, the evidence established that the Owner protested against stowage of the tea in the No. 1 hatch.[5]

The typical clause of the New York Produce Exchange form of charter party provides in part that "The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and the Charterers are to load, stow and trim the cargo at their expense under the supervision of the captain * * *". In this case, the parties utilized that typical form of agreement but amended Clause 8 (by typewritten insert) to read that the " * * * Charterers are to load, *discharge*, stow and trim the cargo at their own expense under the supervision of the Captain *and responsibility of the Captain * * *"*. (Italicizing indicates amendment).

However, in reading the charter agreement as a whole, and as supplemented by the various acts of the parties, I must conclude that the Charterer took great pains to reserve to itself virtually every facet of the stowage. In essence, the evidence is compelling that the Charterer must be faulted for improper stowage. It was the Charterer who prepared the stowage plan showing that the tea was to be stowed in the same compartment as the cresylic acid. So too, it was the Charterer who, after being cautioned by the Master, persisted in stowing the tea near the obnoxious acid to conserve for itself stevedoring expenses.

Additionally, the record shows that the stowing undertaken by the Charterer proceeded in a manner calculated, to large extent, at avoiding pilferage of its cargo of liquor. The Charterer, admittedly, "wanted the liquor buried under the tea" as "more pilfer-proof".

The responsibility for stowing the tea in close proximity to the tank containing the acid must be assigned to the Charterer, and must be considered as a contributing cause of the loss. In point of fact, the Charterer deliberately exposed a delicate cargo to the danger of which it was forewarned by the Master of the ship—who was not, in any way, affirmatively responsible for the improper stow.[6]

Since both the Owner and Charterer were equally at fault and their fault le-

---

5. In addition to the objection lodged by Chief Officer Roiseth with Eames, the Master objected to King concerning the Charterer's unilateral change of plan, but similarly, this protest was disregarded by the Charterer.

6. Cf. A/S Brovanor v. Central Gulf S. S. Corp., 323 F.Supp. 1029, 1032 (1971) and cases cited, imposing liability upon a Charterer and emphasizing: "Although the master accepted the stowage plan as advanced by Central Gulf his primary concern related to the seaworthiness of the vessel, its navigation, and care".

gally contributed to the resulting loss, it is equitable that both should be cast in liability and both should share the loss equally. See, Nidaros v. Oxford Paper Co., 34 F.2d 442 (1st Cir. 1929), rehearing denied, 36 F.2d 227 (1929), aff'd, 282 U.S. 681, 51 S.Ct. 266, 75 L.Ed. 614 (1931); Seaboard Shipping Corp. v. Morgan Inland Waterways Corp., 449 F.2d 132 (2d Cir. 1971), applying contribution in a non-collision case. And see also, Gregory, Contribution Among Joint Tortfeasors: A Defense, 54 Harv.L.Rev. 1170 (1941); Staring, Contribution and Division of Damages in Admiralty and Maritime Cases, 45 Calif.L.Rev. 304 (1957).

Under all the circumstances of this case, the cross claims are dismissed. A decree may be entered accordingly.

The foregoing memorandum, together with the facts stipulated by the parties in the pretrial order, constitute the Court's requisite findings of fact and conclusion of law.