**A/S BROVANOR and Salamis A/S,**
**Third-Party Plaintiff,**

v.

**CENTRAL GULF STEAMSHIP CORP.,**
**Third-Party Defendant.**

**No. 63 AD. 770.**

United States District Court,
S. D. New York.

Aug. 25, 1970.

Haight, Gardner, Poor & Havens, New York City, for third-party plaintiff;

---

Wharton Poor, R. Glenn Bauer, New York City, of counsel.

Symmers, Fish & Warner, New York City, for third-party defendant; William Warner, New York City, of counsel.

EDWARD WEINFELD, District Judge.

The parties to this litigation, A/S BROVANOR, the owner of the S/S SKAUTROLL, and CENTRAL GULF STEAMSHIP CORPORATION (hereafter "Central Gulf"), the time charterer of the vessel, were named as defendants in this action brought by the United States of America and Commodity Credit Corporation[1] to recover damages for contamination of a shipment of flour under the CARE program. The claim of the United States Government was settled for the sum of $110,000, of which A/S BROVANOR, the shipowner, advanced $55,000 and Central Gulf, the charterer, the other $55,000, with a stipulation that the amount of the settlement was fair and reasonable and without prejudice to judicial determination of the ultimate responsibility as between the shipowner and time charterer. Each now claims the other must bear the burden of the entire loss and accordingly seeks indemnity for the amount it paid as well as reasonable counsel fees incurred in defending against the main action.

■ The shipment of bagged flour destined for delivery to Colombo, Ceylon was loaded aboard the S/S SKAUTROLL in April and May 1962 at New Orleans and other United States Gulf ports. The vessel thereafter proceeded to an intermediate stop at Port Esquivel, Jamaica where she was loaded with a cargo of bagged alumina for carriage to Cochin, India which was stored in four holds, either next to or over the flour, as hereafter detailed. When a portion of the flour shipment, stowed in two of the holds, was unloaded at Colombo, Ceylon it was found to have been contaminated to some degree by alumina powder. The entire shipment, whether contaminated or not, was condemned by the Ceylonese Government as unfit for human consumption and was rejected by CARE, the consignee. The issue presented in the remaining aspect of this litigation is whether the shipowner or the time charterer is liable for the ensuing loss. Upon a review of the record, the facts and the law, the Court is persuaded that Central Gulf, the time charterer, must bear the entire loss.

Alumina is a fine white powder, contaminant, highly volatile, with a tendency to get over everything. Bags containing the product are likely to break and scatter their contents into the holds of ships.

Central Gulf was fully familiar with the nature of alumina; it had considerable prior experience with shipments of bagged alumina. The master and the chief mate of the vessel were competent seamen but were unfamiliar with alumina and without prior experience in its stowage or carriage. They relied upon Central Gulf's representatives (principally its chief loading and first loading superintendents) for information as to the nature of alumina and its stowing. Central Gulf not only initially proposed the stowage plan but played a significant role as to the separation of the alumina and flour shipments.

The stowage plan advanced by Central Gulf representatives and accepted by the master provided that in the Nos. 1 and 5 holds the bagged flour was to be a "vertical stow" or "half hatched"—that is, the alumina and flour were to be stowed at opposite ends of the hold. The plan also provided that in the Nos. 2 and 4 holds the flour was to be stowed on the bottom and the alumina stowed over the flour. No. 3 was to be stowed with flour but with no alumina. The master and the chief officer of the SKAUTROLL and representatives of Central Gulf considered a "vertical stow" in the

---

1. The term ship-owner shall also be deemed to apply to SALAMIS A/S, the bareboat charterer of the vessel which appeared as a claimant in the initial suit.

Nos. 2 and 4 holds as well as in Nos. 1 and 5 but all agreed this was not feasible because such stowage would have rendered the vessel unseaworthy for reasons of stability and stress.

The separations differed as the stows differed. In the Nos. 2 and 4 holds the separation was as follows: 1st, a layer of thick paper; on top of the paper, a solid layer of dunnage boards; on top of the dunnage, a plastic tarpaulin; on top of the plastic, another solid layer of dunnage boards; finally, a layer of thick paper. The plastic tarpaulin was lapped up the ship's skin on the sides of the bulkhead fore and aft. In the Nos. 1 and 5 holds plastic tarpaulins were draped over the flour to provide a vertical separation so that the bags of alumina would not come into direct contact with the flour. The ship's crew properly placed the separations while the vessel was en route to Port Esquivel, as had previously been agreed upon. Central Gulf paid for this service and also supplied the materials which constituted the separations.

The SKAUTROLL arrived at Port Esquivel on May 9, 1962, and the bagged alumina was loaded as contemplated by the stowage plan in holds Nos. 1, 2, 4 and 5. The SKAUTROLL then proceeded via ports in the Mediterranean and the Suez Canal to Cochin, India where the alumina cargo was discharged by stevedores engaged through Central Gulf's agents at that port. In the unloading, bags of alumina were torn or burst and their contents were scattered in the holds. In the Nos. 2 and 4 holds loose alumina was in the crevices and tears in the paper and in spaces in the wooden dunnage.

After unloading the alumina at Cochin the vessel next proceeded to Colombo, Ceylon where upon arrival the master was informed by Central Gulf's agent that it was very essential that discharge take place as soon and as fast as possible since stevedore gangs had already been ordered. Although the agent was informed by the chief mate that Nos. 2 and 4 holds were not quite ready for discharge as there was separation and some alumina on top, the agent ordered two sweeping gangs, in addition to the stevedores, the sweeping gangs to remove dunnage, separation paper and plastic, and to sweep up the remainder of the alumina so that the discharge could commence; accordingly, the discharge and cleaning took place at the same time. In the removal of the separation, alumina sweepings fell onto the balers of flour below; alumina seeped through cracks or holes in the plastic; loose alumina also seeped along the ship's sides and the fore and aft bulkhead; the stevedores' method of discharge carried or spread the alumina still further onto other flour balers. Most of the bags which had alumina dust on them were around the outside holds. The discharge operation in the Nos. 2 and 4 holds was stopped upon the demand of a representative of CARE who claimed that the flour was contaminated by the alumina. Thereafter, the Ceylonese Government, for reasons which are not relevant here, contended that the entire shipment, including that contained in holds Nos. 1, 3 and 5 was unfit for human consumption and ultimately it was rejected by CARE, all of which led to the instant suit and the settlement already referred to.

Clause 8 of the Charter Party provides "The Captain (although appointed by the Owners) shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, trim and discharge the cargo at their expense under the supervision of the Captain * * *." Central Gulf contends that since stowage was "under the supervision of the Captain" the method of stowage was his sole responsibility and even though it was consistent with the plan proposed by the Charterers, liability for ensuing cargo damage resulting from improper stowage rests upon the shipowner. However, there is no adequate proof that the stowage per se was improper. But more important, under the facts as here presented there is no basis for casting the shipowner in liability for

improper stowage, lack of proper care for the cargo or otherwise.

The authorities are in accord that under a provision such as clause 8, responsibility for proper stowage is that of the charterer and that liability for improper stowage is borne by it.[2] True, the cases are not four-square—there are suggestions that a different result would follow if the captain were affirmatively responsible for the improper stow but such is not the case here. Although the master accepted the stowage plan as advanced by Central Gulf his primary concern related to the seaworthiness of the vessel, its navigation, and care. As to the stowage of alumina, the evidence is compelling that Central Gulf did not rely upon the master's judgment; to the contrary, he relied upon Central Gulf's.

Central Gulf's contention that it relied on the presumed superior knowledge and experience of the master as to the proper stowage of alumina flies in the face of the facts. Central Gulf's representatives, aware of the master's inexperience with alumina, stressed their own experience. In practical terms Central Gulf took over the stowage and separation of alumina which was within its special competence. The master testified that, based upon the information they gave him about alumina, he considered the stow safe and proper and in this he was justified. Under all the circumstances it cannot be said that the master failed to exercise reasonable care with respect to the stowage, or its supervision. In any event, even had there been improper stowage under the authorities and circumstances here presented, liability therefor is that of the charterer.

Central Gulf, however, seeks to fault the master because of pilferage by stevedores of the plastic separation in holds Nos. 2 and 4 while the ship was loading alumina at Port Esquivel. It argues that, even assuming the separation initially was proper, its "integrity * * * must have been disturbed by the pilferage and it is entirely possible that powder could sift through as a consequence." However, other than Central Gulf's assertion there is no support for this claim. Quite the contrary, the evidence establishes that when the pilferage was discovered the loading of alumina had barely started; that the plastic tarpaulin was promptly replaced; that the separation was effectively reinstated; and that no alumina got on the flour.

■ The proximate cause of the claimed contamination was the lack of due care in the discharge of the alumina at Cochin and of the flour at Colombo, for which the sole responsibility is Central Gulf's. The discharge at Cochin was performed by stevedores engaged by agents of Central Gulf. The alumina was not packed in protective polyethylene bags as Central Gulf had indicated to its agents it would be. Central Gulf, aware that even protective bags are easily punctured and are more satisfactorily handled with platform slings or canvas lined slings, made no attempt to provide or to arrange for the more satisfactory slings. At Cochin, in lifting the bagged alumina out of the holds, the stevedores used as slings a piece of burlap which, when a bag was placed on it, was pulled together from both ends by a rope—an inadequate or a "rather poor" sling for the discharge of this type of cargo, and the ship's officers complained because much breakage resulted. In the unloading, including the sling operation,

2. Oxford Paper Co. v. The Nidarholm, 282 U.S. 681, 51 S.Ct. 266, 75 L.Ed. 614 (1931); The Thomas P. Beal, 11 F.2d 49 (3d Cir. 1926); Jamos Limitada v. S.S. Bernhard Ingelsson, 1963 A.M.C. 1162 (S.D.N.Y.1963); Isbrandtsen Co. v. S.S. George S. Boutwell, 1958 A.M.C. 351 (S.D.N.Y.1957); American Tobacco Co. v. The Katingo Hadjipatera, 81 F. Supp. 438, 444–445 (S.D.N.Y.1948), modified on other grounds, 194 F.2d 449 (2d Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952); The Percy E. Foxworth, 1954 A.M.C. 157 (Arbitration 1953) (Quinby, Arbitrator); Canadian Transport Co. v. Court Line, Ltd., [1940] A.C. 934 (1940). See also Scrutton, Charterparties and Bills of Lading 151 (17th ed. 1964).

bags of alumina were torn or burst and their contents scattered in the holds.

At Colombo the cleanup operation and the discharge were improperly and negligently handled by Central Gulf's agents. This had its origin, already referred to, in the insistence of Central Gulf's local agent that the flour be discharged with haste although he knew that Nos. 2 and 4 holds were not ready for the discharge. It was the negligent conduct of the sweepers that caused alumina to fall on the flour bags below[3]; and the stevedores' method of discharge[4] further spread alumina out among all the cargo. Protests as to the stevedores' discharge operation were of no avail.

Central Gulf seeks to relieve itself of liability for what occurred at Colombo upon a claim that the master was at fault because after the discharge of the alumina at Cochin he had permitted the separations with some accumulation of alumina to remain so that upon arrival at Colombo the removal of the separations and the discharge of the flour were carried out simultaneously. This contention is without merit. It was Central Gulf's obligation to discharge the flour at Colombo in a workmanlike manner and this necessarily included proper removal of the separation. Central Gulf's representative, aware that the Nos. 2 and 4 holds were not ready for the discharge because of the need to first remove the separations, nonetheless directed that the cleanup and the discharge proceed at the same time—the result as already noted was a negligent operation. Moreover, even had the separations been removed prior to arrival of the vessel at Colombo it would not have saved the situation. The negligent unloading of the flour independent of any acts of the sweepers, substantially spread alumina dust in the holds over the flour bags.

Since A/S BROVANOR was cast in liability by Central Gulf's failure to perform or cause to be performed its obligation to discharge the flour with due care and in a workmanlike manner, the A/S BROVANOR is entitled to be indemnified in the sum of $55,000 with interest[5] and for reasonable legal fees which the parties have stipulated to be in the sum of $31,200[6] a total of $86,200 and a decree may be entered accordingly.

The foregoing, together with the facts the parties stipulated are not in dispute set forth in items 1 through 20 of the amended pretrial order, shall constitute the Court's findings of fact and conclusions of law.

3. Among other things, holes in the plastic tarpaulin were caused by men walking across it.

4. The stevedores made a hole in the middle of the cargo to create a slope, like a steep hill and threw or slid the balers of flour down the edges. As a result, "the sacks and the edges which had the dust sometimes would bounce down and come into contact with the other sacks." (T.M. 75). In effect, "what remained along the ship's side and along the bulkheads on the balers would by this manner of discharge be carried further into the cargo and contaminate other balers." (T.M. 98).

5. From July 16, 1969, the date on which it made payment to the United States of America and Commodity Credit Corporation.

6. Each party sought legal expenses (incurred in resisting the claim of the United States of America and Commodity Credit Corporation) in the event it was successful so that it would be fully indemnified. David Crystal, Inc. v. Cunard S.S. Co. 339 F.2d 295, 300 (2d Cir. 1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965); Calderone v. Naviera Vacuba S/A, 325 F.2d 76 (2d Cir. 1963), modified, 328 F.2d 578 (2d Cir. 1964); Paliaga v. Luckenbach S.S. Co., 301 F.2d 403, 409 (2d Cir. 1962); Holley v. The Manfred Stansfield, 186 F.Supp. 805, 811–812 (E.D.Va.1960).