**UNITED STATES of America and Commodity Credit Corporation, Plaintiffs,**

**v.**

**S.S. WABASH, her engines, boilers, etc., et al., Defendants.**

**No. 62 AD 1263.**

United States District Court, S. D. New York.

Feb. 18, 1971.

---

**146**

Zock, Petrie, Sheneman & Reid, New York City, for Midwest Shipping and Trading Corp.

R. C. Giallorenzi, New York City, for Central Gulf SS Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRANKEL, District Judge.

Plaintiffs, the United States and the Commodity Credit Corporation, instituted this action to recover $610,203.26 for damage to cargo shipped aboard defendant vessel, the SS Wabash. Defendant Midwest Shipping and Trading Corporation (Midwest) paid $97,500 in full settlement of plaintiffs' claim. This left for trial and decision the dispute between Midwest, owner of the ship, and Central Gulf Steamship Corporation (Central Gulf), its charterer, as to which should finally bear this liability or, if it is to be shared, the respective portions. The record having been completed by a brief trial, supplementing depositions and other evidentiary materials, the court announces the following findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

The SS Wabash was built in 1940 and laid up in 1958. In 1961 she was purchased by Midwest and underwent extensive repairs in Hoboken, New Jersey, at a cost of $443,853.50. On April 16, 1961, a representative of the American Bureau of Shipping visited the ship "and found her to be in a seaworthy condition and fit to retain her present class with [the] Bureau." The vessel then proceeded to New Orleans, Louisiana, to begin a voyage under a time-charter to Central Gulf dated March 9, 1961.

At a number of Gulf of Mexico ports the Wabash took on United States Department of Agriculture flour bound for various international relief organizations and the government of Jordan, all to be unloaded at Aqaba, Jordan. The ship also took on general cargo bound for intermediate ports. On April 30, 1961, the Wabash departed for New York to load other general cargo.

Beginning on May 2, 1961, when the ship was still en route to New York, soundings in the bilges on the port side of hold number 3 showed a sharply in-

creased depth of water. This abnormal condition was observed by the ship's master and continued through and beyond the time of the ship's arrival at New York on May 5. The ship encountered no conditions of wind or weather to account for the abnormality. Nevertheless, nothing was done either during the stay in New York or afterwards to seek out the source of the excessive water.

The ship's logs, however, reflect continued and particular concern on this subject. After the ship had proceeded eastward from New York, beginning on May 10, the bilges were pumped twice a day, and beginning on the 15th, four times a day. The soundings continued to show depths sufficient to require this sharp increase in the ship's normal course of once-a-day pumping.

When, following arrival of the Wabash at Aqaba on June 1, 1961, the hatches were opened for unloading, workmen immediately noticed a strong odor coming from hatch number 3. An investigation at that time revealed nothing: the hold was "almost full," and the flour that could be seen was "sound flour." Between 9 and 10 o'clock that evening, however, workmen discovered wet bags. The agent in charge of stevedoring promptly ordered that the wet bags, from that time forward, be segregated and counted and unloaded separately from the dry ones. These orders were obeyed, and the wet bags were unloaded separately from then on. It appears possible that some wet and dry bags were later commingled after they came under the control of the consignees, but this, if it happened, was not within the control or legal responsibility of either party now before the court.

The discharge of flour from hold number 3 continued through June 1 and 2. On the evening of the second day the crew reached the source of the water damage: a hole about ¾ inch long and ⅓ to ¼ inch wide in the storm valve of a soil pipe on the after end, port side of hold number 3, about five feet above deck level. Located on the seaward side of the valve, the hole had permitted substantial amounts of sea water and lesser amounts of waste water to reach the bags of flour.

There is some dispute, but not very spirited, as to whether the presence of this hole rendered the vessel unseaworthy. The court, in any event, concludes that it did. In addition, the court finds that (1) this unseaworthy state (or a condition of advanced corrosion requiring only minute further progress to create the holed condition leading to the damage) existed before the commencement of the charter between the parties here, and (2) Midwest has failed to sustain the claim of due diligence on which it seeks absolution from liability. 46 U.S.C. § 1304(1) (1964). The nature of the hole was such that a long-continued course of corrosion was necessary to account for it. By the same token, the shipowner should by the exercise of due diligence have discovered the condition before the commencement of the charter and the loading of perishable cargo into hold number 3. Moreover, the evidence preponderates toward a showing that the ship's master should have sought the cause of the unusual depth of bilge water before the ship left New York, that suitable exploration would have disclosed the holed condition, and that such timely efforts would have prevented much or all of the damage involved in this controversy. And this default, relating to the obligation of seaworthiness, is chargeable to the owner, not the charterer, who had no control over the matter. The time charter provided that "[t]he owners [are] to remain responsible for the * * * crew, and all other matters, same as when trading for their own account." The charterer could and did rely on the ship's master to protect the cargo against unseaworthiness of the vessel. See Oxford Paper Co. v. The Nidarholm, 282 U.S. 681, 684, 51 S.Ct. 266, 75 L.Ed. 614 (1931); Luckenbach

v. W. J. McCahan Sugar Refining Co., 248 U.S. 139, 150, 39 S.Ct. 53, 63 L.Ed. 170 (1918); Olsen v. United States Shipping Co., 213 F. 18, 20–21 (2d Cir. 1914); cf. Munson S.S. Line v. Glasgow Nav. Co., 235 F. 64 (2d Cir. 1916); Bergan v. International Freighting Corp., 254 F.2d 231 (2d Cir. 1958). Midwest has sought to avoid or limit its liability by charging Central Gulf with enhancement of the damage through the intermingling of wet with dry bags. As has been indicated, the record defeats this contention.*

It follows that Midwest is not entitled to recover anything from Central Gulf.

Each side claims attorneys' fees. The issue of when such an award ought to be made in a case such as this has not been extensively briefed by either side; both seem to be going on the assumption that if either is fully liable for the damage, the indemnity relationship arising out of their charter requires that the party liable pay attorneys' fees as part of saving the indemnitee harmless. This view has support in the precedents of this court and the Second Circuit. See A/S Brovanor and A/S Salamis v. Central Gulf S.S. Corp., 323 F.Supp. 1029 (S.D.N.Y.1970) (Weinfeld, J.); David Crystal, Inc. v. Cunard S.S. Co., 339 F.2d 295, 300 (2d Cir. 1964) cert. denied, John T. Clark and Son v. Cunard S.S. Co., 380 U.S. 976, 91 S.Ct. 1339, 14 L.Ed.2d 271 (1965); Paliaga v. Luckenbach S.S. Co., 301 F.2d 403, 409 (2d Cir. 1962); Shannon v. United States, 235 F.2d 457, 459 (2d Cir. 1956). It has been stipulated that the attorneys' fees fairly and reasonably expended on each side total $7,500. Upon these submissions, the court awards that amount to Central Gulf.

Settle a decree on notice.

* At page 4 of its post-trial memorandum, Midwest says: "At the outset of discharge, the damaged bags were put aside on the vessel but this segregation was abandoned. Joudeh, R. 28, 29, 30)" The cited references do not support the statement.