Leonard IMANUEL, Plaintiff,

v.

LYKES BROS. STEAMSHIP CO., INC., Defendant and Third-Party Plaintiff,

v.

TODD SHIPYARDS CORPORATION, Third-Party Defendant.

No. 72 Civ. 498 (E.L.P.).

United States District Court, S. D. New York.

April 23, 1976.

Boal, Doti & Larsen, New York City, for defendant and third-party plaintiff; Joseph E. Doti, Arthur M. Boal, William P. Larsen, Jr., New York City, of counsel.

Darby, Healey & Stonebridge, New York City, for third-party defendant; Thomas H. Healey, New York City, of counsel.

PALMIERI, District Judge.

This is a claim for indemnity arising out of a personal injury action brought by a seaman, Leonard Imanuel, under the Jones Act, 46 U.S.C. § 688, against his employer, Lykes Bros. Steamship Co., Inc. (Lykes). Lykes, a shipowner, has impleaded Todd Shipyards Corporation, a repair yard (Todd or Todd Shipyards), as a third-party defendant. Imanuel's underlying claim was settled before trial by the payment of $325,-000.00 by Lykes Brothers. Asserting that Todd Shipyards was solely liable for the injuries, Lykes is seeking indemnity from Todd for the amount of the settlement on the ground that Todd breached its warranty to perform certain ship repairs in a careful and workmanlike manner. There is no issue before this Court regarding the amount of the settlement. The sole issue is whether Lykes has sustained its claim for indemnity against Todd.

The S.S. NANCY LYKES, the vessel on which the accident occurred, had been extensively altered and repaired by Todd over a period of months (between June and October 1971) before the occurrence of the accident. However, the events relevant to the accident took place substantially within a short period of time prior to its occurrence on December 10, 1971. The ship was tied to a pier at Houston, Texas at that time. The plaintiff seaman was one of the crewmen who had joined the ship only a few days before in preparation for its return to service.

The elevator platform and its related equipment were maintained and controlled by Lykes. On the day of the accident and for a number of days before, it was used by the ship's crew. No claim is made by Lykes that Todd's conversion and repair work in any way included work on the elevator platform. Lykes' claim for indemnity against Todd rests upon a factually circumscribed claim that Todd in performing certain work in the engine room early in December 1971, and in moving machinery through the elevator shaft by an overhead crane, struck the cables and damaged them. There were no eyewitnesses to any such occurrence, Lykes' claim resting entirely on circumstantial evidence.

At the time of the accident, the plaintiff Imanuel was working with his immediate supervisor, Chief Electrician Haag, on the engine room elevator platform. The work had progressed for several hours before the accident. Imanuel and Haag were checking its operational condition and, in the process, disconnected practically every electrical safety device of the equipment. Neither Imanuel nor Haag was an elevator mechanic. They were electricians. Both men were standing on the elevator platform checking a switch when Haag decided to leave to fetch a meter for further tests. The platform had been raised to its uppermost limits at the main deck. Just as Haag stepped off the lift platform and onto the main deck, Imanuel heard a loud grinding noise and the lift began a free fall down the shaft with Imanuel aboard. He was severely injured, having fallen about the equivalent of four stories, or about 60 feet. The immediate cause of the fall, or perhaps its result, was the substantially contemporaneous parting of the sustaining cables. They were severed, as though with a knife, by an impact occurring at the time of the accident. They were cut at about the same distance from the anchored ends. The fall of the platform might have been prevented if the broken rope safety device under the platform intended for just such a calamity, had been operable. But it had never been maintained by Lykes and it is reasonable to infer that it was permitted to become useless. In any event, the evidence is quite clear that the cables were in satisfactory condition prior to the accident. They did not part because of any inherent defect or because of any lack of tensile strength. In short, Lykes has failed to prove any actionable fault by Todd. The findings of fact and conclusions of law which follow are intended to substantiate and to amplify what has already been said, and to demonstrate that Lykes has not sustained its claim of indemnity against Todd Shipyards.

## FINDINGS OF FACT

1. The plaintiff, Leonard Imanuel, was employed by Lykes Bros. Steamship Co., Inc. (Lykes) as a member of the crew and as a second electrician aboard the S.S. NANCY LYKES, a cargo vessel of about ten thousand gross tons.

2. Lykes is a corporation organized and existing by virtue of the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana. It was at all relevant times the owner of the S.S. NANCY LYKES.

3. Todd Shipyards is a corporation organized and existing by virtue of the laws of the State of New York with its principal place of business in the Borough of Manhattan, City and State of New York.

4. On December 10, 1971, while working as a crewman in the employ of Lykes, the plaintiff was seriously injured when the engine room lift, an electrically operated platform type elevator used for the movement of stores and on which he was working, fell to the bottom of the elevator shaft.

5. On February 3, 1972, plaintiff commenced this action under the Jones Act and the General Maritime Law against Lykes to recover damages as a consequence of the injuries sustained by him in the accident hereinabove described.

6. On November 1, 1972, Lykes commenced a third-party action against Todd Shipyards Corporation (Todd or Todd Shipyards) under the General Maritime Law claiming indemnity for any recovery by plaintiff against Lykes on the ground that any liability of Lykes to plaintiff would have been brought about by the failure of Todd Shipyards to perform repair work undertaken by it on the S.S. NANCY LYKES in a safe and workmanlike manner.

7. Plaintiff's case against Lykes was settled and discontinued for the sum of $325,000.00, which was paid by Lykes. A judgment was entered for this amount against Lykes on November 29, 1974, and plaintiff's satisfaction of judgment was entered on December 17, 1974.

8. No issue is presented in this third-party action with respect to the settlement of the seaman's action. Todd has conceded the reasonableness of the amount of settlement.

9. From about December 3 to about December 6, 1971, Todd Shipyards moved certain materials into and out of the engine room of the S.S. NANCY LYKES while it was moored at a Todd shipyard dock. It used the shaft of the engine room lift for this purpose by means of an overhead shore crane with hook and falls. Todd did not use the engine room lift at any time. The lift platform remained at the bottom of the shaft throughout the Todd work in the engine room. Lykes had requested Todd not to use the platform.

10. None of Todd's work had any relation to the repair or maintenance of the engine room platform lift.

11. There is no eyewitness proof that any of the materials moved by Todd through the shaft touched or damaged the cables.

12. There is no persuasive evidence that Todd used the shaft in question during the repair and reconversion work between June and October, 1971. During this period access plates were opened or cut through the bulkhead and used as means of access to the engine room. These access openings were closed before October 15, 1971.

13. Todd performed new work of a limited nature in the engine room, at Lykes' request, early in December 1971. Since there was no time to reopen the access plates and Lykes had forbidden the use of the lift platform itself and had deactivated it, Lykes was chargeable with notice of the likelihood that Todd would use the elevator shaft to move materials in and out of the engine room. Such use of the elevator shaft was customary and proper on this class of ship.

14. Although Todd moved machinery and repair items into and out of the engine room of the S.S. NANCY LYKES, about December 4 and 5, 1971, using the elevator shaft as a means of ingress and egress, there is no persuasive evidence that the supporting cables of the engine room platform lift were struck or damaged in the course of this work.

15. In order to effect the movement of machinery and repair items just described, a stationary gantry crane was spotted so that the head was plumb over the opening of the shaft. The runner descending from the gantry was joined at the end to a load block. Beneath this was the cargo hook. The load block never entered the shaft. From the hook, slings of proper length were affixed to stretch from the shaft opening to whatever level of the engine room materials were to be moved. With the gantry in plumb position, vertically above the opening, it is reasonable to infer that the lifting or lowering of machinery and repair items was done in a straight up and down fashion. The heaviest object lowered through the shaft by Todd was a manifold weighing about 300 pounds. There is no evidence from which any inferences can be drawn that the manifold or any other objects moved through the shaft by Todd's crane dented the wall of the shaft, touched the cables or interfered in any way with the platform lift equipment; or that any wind or weather conditions had any effect.

Signal men to insure a reasonable lift were placed at the main deck opening and within the engine room to serve as eyes for the crane operator. In addition, when the nature of the lift warranted, a line was fixed to the end of the material to insure a steady lift.

16. Lykes admits that there is no eyewitness proof that this method failed or caused contact between materials and the cables.

17. The sustaining cables of the platform lift were severed at the time of the accident to the plaintiff seaman.

18. Immediately before the accident the lift was at the uppermost limits at the top of the shaft. The testimony of plaintiff Imanuel and Chief Electrician Haag that the lift platform was about two feet below the upper limit switch just before the accident is rejected by the Court as inaccurate and inconsistent with the credible evidence.

19. Imanuel heard a loud noise just before the platform fell. He was then standing on the platform and Chief Electrician

Haag, about to leave the lift, had one foot on the platform and the other on the main deck. If the lift platform had been two feet beneath that switch, as Haag and Imanuel recalled years later, it would have been impossible for Haag to have been straddling the deck and lift or to step off the platform onto the deck since the switch was yet another two feet below the deck.

20. On or about December 1, 1971, and continuing to December 10, 1971, Lykes was assembling its crew and outfitting the S.S. NANCY LYKES in preparation for its return to service. It appears likely that her full crew was aboard by December 10, 1971.

21. Chief Electrician Haag and Leonard Imanuel admitted that they had operated the lift for several hours before the accident on December 10 while checking the controls and limit switches. Haag considered it likely that other crew members, particularly engine room personnel, had been using the lift shortly before December 10.

22. The elevator shaft was carefully inspected by Lykes' marine surveyor, Noel Thompson, and by John Peuler, Lykes' claims manager. They could provide no evidence that Todd had caused any material to touch the cables.

23. During the course of his testimony, Mr. Thompson "suggested the possibility" that during Todd's conversion work (during the June-October 1971 period) "materials had been removed from the vessel through the elevator shaft and that the cables had been damaged at that time, resulting in final failure on December 10, 1971." This testimony is rejected by the Court as based upon conjecture and inconsistent with the relevant circumstances as derived from the credible proof. Mr. Thompson appeared in court and testified as follows:

"THE COURT: You see, if you are playing detective and speculating yourself into a conclusion, that is one thing. If on the other hand you are basing your conclusion upon objective facts which can be understood and evaluated, that is another thing. And it is very important for me to know what this suggestion is based upon, and I want you to tell us fully every ground that you have for making this suggestion.

"THE WITNESS: The main one being that the two cables parted at exactly the same position, which I think is most unusual, and which to me gave thought to something, regardless of when it was, must have struck those cables in some position.

"THE COURT: Well, aren't you saying in effect that you can't explain the break of those cables, and so you are trying to find some explanation for it other than what you were able to observe?

"THE WITNESS: That is correct, sir."

24. Another marine surveyor employed by Lykes, Russel Brierly, described the break in the cables as "straight across, as though the cable had been cut," observed that "the guard to prevent the cable jumping out of the sheave was bent up on both ends instead of following the curve of the sheave;" and that "the external visual appearance of the cable, drum, motor and sheave * * * appeared in satisfactory condition." He recommended that the platform car sheaves be examined "to determine if these sheaves could possibly have cut the cables." His testimony supported Todd's contentions that the cables of the platform lift were in satisfactory condition prior to the accident, and that the break in the cables occurred at the time of the accident.

25. The bulk of the testimony of Roger Kiste, a testing laboratory metallurgist, who was called by Lykes as an expert witness, is rejected by the Court as unpersuasive. The cables upon which his testimony rested had been cut up by a machine so that he eventually and after considerable handling and transportation received 16 sections of it for examination. These sections were left in a wooden crate in a warehouse for some time after they had been cut up and were later shipped by air freight from New Orleans to the testing laboratory in Pittsburgh where they were examined. He could not state at what particular time the damage by impact which he found had oc-

curred. Nor were his measurements made with any great degree of care. The cutting of the cable for study appears to have been done in a machine shop in New Orleans with the wrong type of machinery.

26. To the extent that Kiste's testimony can be construed as a finding that the cable showed kinking and flattening other than at the area of severance it was inconsistent with the testimony of three witnesses, Thompson, Brierly and Haag, who inspected the cable immediately after the accident. The cable pieces were moved about in a crate over a long period of time thereafter and Kiste was unable to identify with precision the sections of cable represented by the identification tags.

27. Kiste's finding of a minimum breaking strength of 5200 pounds per cable is accepted. Since the elevator platform was suspended in such a manner that its weight was sustained by the equivalent of four cables, it had a minimum lift strength of 20,800 pounds.

28. The platform lift, with the two crewmen on it, did not even approach a deadweight sufficient to part the cable. This would be so even if 25% of the cable were damaged, as Lykes appears to contend.

29. The testimony of Joseph DiCocco demonstrated a thorough familiarity with the platform lift in question. He was a trained elevator mechanic employed for many years by Energy Elevator Company, manufacturer of the lift in question, and had done construction, maintenance, service and repair work on elevators, dumbwaiters and escalators. He had participated in the installation of the very platform lift in question on the S.S. NANCY LYKES and was familiar with the maintenance manual issued by his employer for the purchasers of this equipment. His testimony is accepted as entirely credible.

30. The underside of the car platform was equipped with a mechanical safety device called a broken rope safety, consisting of a spring-fed lever which, if not held in place by tense cables, would be activated by causing eccentric cogs to engage the rail thereby stopping the lift and locking its position and preventing any free fall of the platform.

31. The broken rope safety device had no outer covering. It required lubrication. It had to be kept free of rust, dirt and incrustation to insure its proper functioning. Lubrication could be accomplished only by a special alemite grease gun which could engage all the fittings and which was furnished with the platform lift or obtainable from the manufacturer. There is no evidence that Lykes ever possessed or used such a grease gun. When questioned about the broken rope safety device, Haag, who was charged with maintenance of the lift, admitted that he did not know the safety device existed. There is no evidence that elevator mechanics were ever employed by Lykes for the care and maintenance of the lift. The broken rope safety was incrusted with rust and dirt at the time of the accident. Lykes' failure to maintain this safety device was in direct violation of a Coast Guard regulation, 46 C.F.R. § 110.10–1(g), which incorporates by reference the American National Standard Safety Code for Elevators, Dumbwaiters and Escalators, § 1002.1f.

32. A lack of lubrication could have prevented rotation of the sheaves beneath the platform.

33. Each of the guide rails on which the platform rides, located on opposite sides of the shaft, has a place for a bolt to be inserted through it near its top, forming a T configuration. The purpose of these bolts is to stop the platform in the event the limit switch is overrun at the uppermost point of movement. Neither of these bolts was in place at the time of the accident. Lykes has made a post-trial suggestion that the bolts were removed only after the accident in order to permit removal of the platform from the shaft for photographing purposes, but the record does not sustain this suggestion.

34. It appears probable from the testimony of DiCocco that without the restraining bolts at the top of the rails, and with

the platform operated to its uppermost limits, the cables under the platform could have become disengaged from their sheave grooves, thereby coming into contact with the machined edge of the sheave and creating a danger of cable cutting. This danger is increased if the sheave is restricted in free movement or actually seized. It is reasonable to infer that there was no lubrication or maintenance over a long period of time of the entire undercarriage of the platform including the broken rope safety device and the sheaves under the platform. It is also reasonable to infer that the cables may have been cut at the time of the accident because of the situation just described resulting in the broken rope safety device being inoperable and in the undercarriage sheaves being stuck fast.

35. When the plaintiff Imanuel and Chief Electrician Haag were checking the platform controls prior to the accident they did so in such a way as to by-pass the electrical circuitry controlling the limit switches as well as other safety features built into the equipment to control the movement of the platform when the electrical motor is operating. These features included: door interlocks, limit switches and a slack cable switch.

36. By closing the relays with a screwdriver, as Imanuel and Haag were doing prior to the accident, they by-passed all the safety devices which operated from the same circuit, thus allowing the lift to ·function without control and thereby creating a risk of reverse spooling and of contact between cable and cutting edges (e. g., 3 sheaves, sheave guard, machined opening in the bulkhead wall).

37. In operating the car with no safety or automatic features in circuit, Imanuel and Haag acted with utter disregard of their own safety. Todd contends that they caused a reverse winding of the cable on the drum by this procedure ultimately causing the cable to be cut by the sharp machine edge of the bulkhead after operating the lift to its extreme height. This contention has some support in the evidence, but this Court is not persuaded that

an explicit finding to this effect can be substantiated or is necessary to support its conclusions.

38. There is yet another plausible theory. The cables that raised and lowered the platform were secured to the drum, which wound the cable in and out and stored the extra cable. The drum was located approximately 10 feet below the top of the shaft. The cables played out from the *lower* side of the drum, went up and over a sheave fixed at the top of the same side of the shaft, then went back down under the platform, passing under a sheave at both sides of it. The cables then ran back up the opposite side of the shaft and were anchored near its top. As the platform was raised near the top of the shaft, the sheaves beneath it would eventually approach the level of the wall sheave. The cable, running from the drum to the wall sheave, would then begin to assume a horizontal path on leaving the wall sheave, rather than going straight back down as when the platform was lower in the shaft. If the platform went high enough, the cables would work their way off the wall sheave. Once off the wall sheave, the cables would no longer support the platform. They would be held up on one side of the shaft by the anchor and on the other only by the fact that they were wrapped around the drum far below the wall sheave. Consequently, the cables and the platform would fall. As the platform fell with the slack cables beneath it, the cables would eventually become taut somewhere below the drum. In this position they would run from *beneath* the drum, out and *down* over the machined edge of the bulkhead, beneath the platform and then back up to the anchor. It is plausible that the falling weight of the platform with Imanuel on it could have snapped the cables against this bottom machined edge of the bulkhead with enough force to sever them cleanly and evenly without halting the free fall of that weight. If this theory is correct, the accident was caused by raising the platform too high beyond the disconnected safety devices, and the cables' rupture was a result rather than a cause of the accident. The Court does not find that

this or any of the theories advanced is the final explanation of what happened. Rather the Court relies for its decision on the fact that Lykes has completely failed to prove that Todd's activities were causally related in any respect to the accident.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter of this litigation.

 2. Lykes has failed to sustain its burden of proof that Todd caused damage to the cables of the engine room lift platform of the S.S. NANCY LYKES which resulted in their parting on December 10, 1971.

 3. Lykes was negligent in the care, maintenance and operation of the engineer's lift platform. This negligence was the cause of the accident on December 10, 1971.

 4. The operation of the engineer's lift platform by plaintiff Imanuel and Chief Electrician Haag prior to the accident on December 10, 1971 was grossly negligent and in utter disregard of their own safety. They were both unfit to perform the duties in which they were engaged since they had no training or experience as elevator mechanics and were employed solely as electricians.

5. Todd was not negligent in any respect nor did it breach its warranty of workmanlike service.

 6. Todd is entitled to final judgment dismissing Lykes' claim for indemnity with costs and disbursements. Todd has requested an award of attorney's fees. However, Todd cannot claim a right to these fees. *See Calderone v. Naviera Vacuba S/A*, 328 F.2d 578 (2d Cir. 1964). Assuming without deciding that the Court could grant Todd an award of attorney's fees, *compare United States v. S/S Wabash*, 331 F.Supp. 145, 148 (S.D.N.Y.1971) *with Ring v. Motor Vessel Cape Clear*, 226 F.Supp. 709 (N.D.Cal.1964), the Court declines to award such fees to Todd because

during the early pretrial discovery procedures Todd mistakenly led Lykes to believe that it had not used the elevator shaft; whereas in the later development of pretrial discovery Todd was constrained to admit its use of the shaft in December 1971. While the Court does not impugn the good faith of Todd, this unhappy *volte-face* on Todd's part created understandable suspicion on the part of Lykes and probably created needless expense and inconvenience for Lykes. Under the circumstances an award of attorney's fees to Todd would be unjustified.

Submit proposed judgment on notice consonant herewith.