THE DANA.

(District Court, E. D. New York. June 9, 1911.)

1. SHIPPING (§ 121*)—SEAWORTHINESS OF VESSEL—IMPLIED WARRANTY.

   The acceptance of cargo by the master of a lighter without objection to the quantity is an implied representation that the vessel is seaworthy for the carriage of such quantity.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 449; Dec. Dig. § 121.*

   Implied warranty of seaworthiness, see notes to The Carib Prince, 15 C. C. A. 388; Neilson v. Coal Cement & Supply Co., 60 C. C. A. 179.]

2. SHIPPING (§ 121*)—LOSS OF CARGO—LIABILITY OF VESSEL—UNSEAWORTHINESS.

   A steam lighter under contract to carry a deck load of 173 tons of copper to be loaded on a steamship, while lying in a slip at Hoboken that night waiting to unload, and while her crew were absent, listed and dumped a part of her cargo. She could safely carry a deck load of from 150 to 160 tons, and on previous occasions a load of 180 to 190 tons had caused her to spread and leak. The weather was calm, and under the evidence it appeared that the listing was probably caused by the presence of water in the vessel, due either to leakage caused by overloading or to water siphoning from a tank through failure to close a cock. *Held* that, in the first case, the vessel was not seaworthy for the voyage, and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in the second she was not properly cared for by her crew, and in either case was liable for the loss.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 450; Dec. Dig. § 121.*]

3. SHIPPING (§ 113*)—CONTRACT OF AFFREIGHTMENT—PLACE OF DELIVERY.

A contract by a lighter to carry a cargo from **Chrome, N. J.,** to New York, covered its carriage to the Hoboken docks.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 427; Dec. Dig. § 113.*]

4. SHIPPING (§ 141*)—CHARTER—LIABILITY FOR LOSS OF CARGO.

Under a charter to carry a cargo which provided that the owner should provide a seaworthy boat, a further provision exempting him from "marine risks" did not relieve him from liability for cargo which was dumped from the deck by the listing of the vessel due to excessive or uncared for leakage.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 497; Dec. Dig. § 141.*]

5. SHIPPING (§ 27*)—SALE OF VESSEL—RIGHTS OF PURCHASER—LIENS.

Where, at the sale of a vessel in an action at law, announcement was made of a maritime lien claimed against it, the purchaser was charged with notice of, and took subject to, such lien if established as a prior lien.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 90; Dec. Dig. § 27.*]

In Admiralty. Suit by the United States Metals Refining Company against the steamlighter Dana. Decree for libelant.

Wallace, Butler & Brown (Archibald G. Thacher, of counsel), for libelant.

Wray & Callaghan (Stephen Callaghan and Nelson L. Keach, of counsel), for claimant.

CHATFIELD, District Judge. The claimant purchased at a sale under judgment the steamlighter Dana, which had previously dumped a portion of a deck cargo of copper, upon the night of November 25th, in the slip between the lower North German Lloyd pier and the upper Hamburg American pier, in the Hudson river, at Hoboken, N. J. Upon the afternoon of the night in question, the Dana was moored alongside of a large square-sided barge, the Seneca, while waiting to load the copper upon the steamer Kaiserin Augusta Victoria, which was lying on the other side of the slip. The crew of the Dana were ultimately produced upon the trial. They testified that they left the vessel in good order after their day's work was done, and that all of them went ashore. The engineer testifies that the vessel was then free from water, and not leaking; that his fires were banked, and there was no steam to work the steam pump, while the deckhands even left the vessel to go to a theater in Hoboken, **returning** in the neighborhood of midnight. A watchman furnished by a company hiring men for that purpose was upon the vessel to see that none of the cargo was stolen, and that no damage was done, and upon the return of the two deckhands, between midnight and 1 o'clock, this watchman was found standing watching the Dana. Her list was such that, according to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

their testimony, the watchman advised them not to go on board, and one deckhand stayed upon the pier, while the other one, who had left some money in his berth forward in the Dana, went on board and saved the money, but scarcely had time to get back to the dock before the Dana listed to starboard, and the greater part of her deck load of copper was thrown into the slip between her and the square barge to which she was tied. Her lines were broken, and part of the rail carried away by the copper, which caused marks and gashes in the side of the square barge. The loss of the rail and these marks upon the side of the square barge were the only indications of any violence or contact between the boats.

The Dana was a round-bottomed craft, with a pointed bow arranged for carrying the greater part of her load upon the deck rather than in the hold, and forward rather than aft. She thus rode higher at the bow when unloaded, and the carrying of a deck load balanced the weight of her machinery, which was placed well aft. She had just previously been repaired and her seams caulked, in so far as they showed the necessity of repair when she was light, but not drawn out of the water. The testimony indicates that she was able to carry a load of some 150 to 160 tons upon her deck with apparent safety. A load of more than that amount set her down by the head sufficiently to make her steer with some difficulty, and on previous occasions a load of 180 to 190 tons had caused a spreading of the boat and a leaking, which was not apparent when the load was not excessive. On the afternoon in question she had brought up a cargo of 173 long tons upon the deck, while her hold was filled with bundles of shingles. The conditions were such in coming up the bay that no excessive strain and no resultant damage can be traced to anything, unless to the weight of the deck load itself. A secret or undiscoverable leak between the skin of the vessel and the false lining to the forecastle is indicated by the testimony of some of the witnesses. The facility with which bilge water could run back through the limber holes, and the possibility that water could collect at the bow in a sufficient amount to affect the stability of the vessel, was indicated by the testimony of some of the witnesses.

The most difficult point in the case has to do with the amount of water in the vessel after the load was dumped, because of the testimony of the engineer of a Hamburg-American tug, who was summoned by the watchman just before the accident, and who arrived within a few moments thereafter upon his tug, having come around from a pier to the south of the pier in question. This engineer, who sounded the water in the Dana, examined it through the well, and testifies that it did not come over the floor beams of the vessel at that point. He did not try to use his pump, for he estimated that the water was not more than six inches deep in the well, and his pump would suck at a depth of eight inches of water. He could find nothing on board of the Dana indicating the presence of sufficient water to affect her equilibrium, nor anything from which he could draw an explanation of the accident. Another witness at daylight the following morning when the vessel was lightened of a

great part of her load, and when she had been untouched so far as pumping was concerned for five or six hours, also testifies that there was no water in the boat. The engineer of the Dana testifies that he found 10 inches of water when he returned that day. Winslow, a witness for the libelant, but in the employment of the North German Lloyd Line, who arrived at the scene shortly before the tug, and who found the cargo already dumped, testifies that he saw and measured seven inches of water in the hold at the same point at which the Hamburg-American's engineer shortly thereafter found not enough to pump. The captain of the Dana, however, testifies that the engineer measured the water in the well, and found 22 inches when he arrived in the morning. No pumping had been done in the meantime, and it must be held that the amount of water estimated by this witness could not have been present during the night before, unless it had not yet distributed itself aft for some time after the accident, and thus did not disclose signs of its presence when the engineer of the Hamburg tug came on board. This testimony indicates the difficulty as to the whole case. The libelant claims that the boat was unseaworthy, in that it was not fit to carry the cargo which its captain undertook to take from Chrome, N. J., to the dock in question.

[1] It appears that the load was furnished by the libelant, and that the quantity offered was also determined by the libelant's agent, while the captain of the vessel only supervised, in a general way, the placing of the cargo, and indicated the quantity which he would undertake to carry. Here, again, the master's actions were of a negligent character. He did not refuse or object to carry the amount offered, nor did he object to the way·in which the load was placed upon his vessel. So it must be assumed that he undertook the voyage with the cargo in the condition in which it was put upon his vessel, and therefore that the vessel was held out to be seaworthy, to the extent of being able to undertake what her master undertook to do with her. The Oneida, 128 Fed. 687, 63 C. C. A. 239, citing The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65. The libelant also claims that unseaworthiness was shown by her making water while lying at the pier in question, as indicated by the water which the witnesses above referred to say they found in her after the load had been dumped. The allegation of unseaworthiness has been contradicted as has also the charge of leaking, and upon all of the testimony it would seem than even if the vessel were cranky, so that she steered badly with such a load, or that she might have difficulty in rough weather, nothing occurred upon this trip from which such defects might be held a violation of the implied warranty of seaworthiness.

[2] The whole case comes down to the charge that with the amount of copper which she attempted to carry her seams were opened, or the vessel strained or spread sufficiently to allow leakage enough to destroy the equilibrium when resting in the slip, with a deck load of the sort in question. The claimant has attempted to show that the swells of passing vessels and the conditions of weather

were such that the accident might have been caused by a wash or rough water within the slip. The velocity of the wind, general conditions of weather, the locality when considered in connection with the direction of wind shown, and the failure to indicate any unusual effect of passing vessels utterly deprive the claimant of any defense on such grounds, other than the general burden which rests upon the libelant to show that the accident occurred from the presence of water within the vessel.

There is also no evidence to indicate that the lighter and the Seneca came in contact or that the barge rested upon the lighter, so as to bear down the starboard side of the lighter sufficiently to do it any injury. On the contrary, the testimony would show that the vessels were properly moored and rested quietly, but that, when the deckhands returned, the lighter had already listed toward the barge, and was straining the lines thereto.

The libelant has also offered some testimony as to two water-tanks so placed upon the vessel that the pipe leading to the boilers, and shut off by the stop-cock between these two tanks, could be affected by the operation of this connecting pipe as a siphon, if the stop-cock were left open. The general position of these tanks, the amount of water which they contained, and the fact that, even if the stop-cock was open next morning, the weight of water would not by itself cause a dangerous list, do not indicate such carelessness because of the condition of this stop-cock as to entirely explain the accident. But the slight additional list from this source may have aided in producing the condition of danger, and for this the boat must be charged.

We are reduced, therefore, in the absence of any suggestion that the load shifted, or that the balance of the boat was disturbed by anything except the water inside the hold, to a consideration as to whether the libelant has proven his case by showing that the accident occurred from leakage, and that the leakage occurred from the spreading of the vessel and the opening of seams through the carrying of such a load. The water in the vessel, whether much or little in quantity, would quickly respond to the decided change in level caused by the dumping of the deck load. But the lightening of the load forward should have caused a flow of water toward the stern, where the weight of the engines was constant, and, if on the following morning more water had shown in the stern than was noticed at midnight, it would logically follow that the water which during the early part of the night had caused the boat to list when heavily loaded at the bow had gradually run toward the stern and distributed itself so as not to affect the equilibrium. In fact, the testimony as to a hidden and secret leak indicated that the water from this leak came in near the bow, and the testimony of the witness Tuttle to the effect that 22 inches of water was present in the engine room at 8 o'clock goes to show that a considerable quantity of water was in the bow of the boat up to the time when the load was dumped. Assuming that the list was caused by the presence of water either accumulating from leakage or from siphoning from

the tank, the conclusion necessarily follows that the claimants were negligent in providing for the care of their boat. And if the accident happened because the boat was so unstable or so weak that the deck load of itself caused a twisting or bending of the entire frame out of equilibrium, so as to gradually cause a list, again, the owners should be held responsible, for such a boat could not be considered seaworthy, and the testimony as to previous cargoes would indicate that they had had sufficient notice of such defect.

[3] The claimants have interposed an additional defense, the contract under which the boat was carrying the particular cargo, which provided that copper pigs should be carried from Chrome, N. J., to New York. It is urged that, inasmuch as this was a cargo to Hoboken, it was not within the contract, and that, therefore, the general provisions applicable to a common carrier would cover the situation. But there is no reason to hold that the contract in question was not intended to and did not cover a voyage to the Hoboken docks as well as to docks in Manhattan or Brooklyn. The charter, however, did provide that the carrier should not be responsible for "marine risks," but should provide only "seaworthy boats," and should bear all expenses caused by "unseaworthy craft."

It is urged that under this contract the owners of the boat were neither common carriers nor bound under the language of the particular charter. While it would seem that a charter of this nature for the performance of a particular service, and providing by its terms for particular conditions, would have to be viewed by those provisions, and that the parties thereto should not depend upon the general obligations of a common carrier, where the particular contract took the place of a common carrier's liability, nevertheless, aside from the language of this particular charter, the obligation of the owner seems to be no different from that of a common carrier in providing a seaworthy boat.

[4] As to the claim that the words "marine risk" are not equivalent to "perils of the sea," and that they absolve the carrier from responsibility for such an accident as the dumping of cargo because of excessive or uncared-for leakage, an examination of the authorities and a consideration of the dangers and accidents at sea, usually considered as perils of the sea, show that such an exception cannot include the effects of ordinary leakage, when allowed to cause danger by the neglect of watchmen, when the vessel is lying at a dock, nor do these words cover such a case as the unusual weakness or crankiness of a vessel, when furnished as seaworthy for carrying a special cargo.

[5] As to the defense that the sale of the boat to the present claimant was made in such a way that he became an innocent purchaser for value, without notice of the maritime lien claimed because of the loss of this cargo of copper, it need only be said that the sale seems to have been properly conducted, and was in an action at law rather than in admiralty, that the claim for the loss of this cargo was made known at the time of the sale, and a purchaser signing the terms of sale must be held to have assumed the obligation of any lien which would have been called to his attention

if he had made inquiry or paid attention to the sale. Further, the purchaser is shown to have been either within hearing distance or actually present at the time that the announcement of this lien was made, and must be held either to have heard it at the time, or to have disregarded what he should have paid attention to, even if it be not considered that he purposely avoided listening to what might be said.

The libelant may have a decree, with costs.