OXFORD PAPER COMPANY *v.* THE NIDARHOLM.

No. 58. Argued January 20, 1931.—Decided February 24, 1931.

Messrs. *John W. Lowrance* and *Nathan W. Thompson* for petitioner.

*Mr. Robert E. Goodwin* for respondent.

MR. JUSTICE STONE delivered the opinion of the Court.

Petitioner, charterer of the Steamship "Nidarholm," brought this admiralty suit *in rem* in the District Court for Southern Maine, to recover damages for the loss of part of a cargo of pulpwood from the deck of the vessel, where it had been stowed by the charterer. The time charter party, which was in the usual "government form," see *Golcar S. S. Co.* v. *Tweedie Trading Co.,* 146 Fed. 563, placed at the charterer's disposal "the whole reach of the vessel's holds; decks and usual places of loading," and provided that "charterers . . . load, stow, and trim the cargo at their expense under the supervision of the captain." The question was whether, under these clauses of the charter party, the ship was liable for the loss, although one of its causes was the failure of the charterer to make the deck load secure. Judgment for the libellant, petitioner here, in the District Court, 26 F. (2d) 92, was reversed by the Court of Appeals for the First Circuit, which divided the loss. 34 F. (2d) 442; rehearing denied, 36 F. (2d) 227. This Court granted certiorari, 281 U. S. 712, on a petition which relied in part on an alleged conflict of the decision below with that of the Court of Appeals for the Second Circuit, in *Olsen* v. *United States Shipping Co.,* 213 Fed. 18.

The District Court found the facts as follows. The Nidarholm was chartered by petitioner for the purpose of carrying pulpwood from its plant at Murray, Nova Scotia, to Portland, Maine. In loading for the voyage in ques-

tion, petitioner, after the hold was filled, piled the logs of pulpwood, cut in two-foot lengths, on the deck to a height of 17 feet. The deck load was secured by a crib, which petitioner constructed by erecting, at intervals along the rail, stanchions about 20 feet long and from 8 to 10 inches in diameter at the butt. The stanchions were held in position by wire rope lashings. When the ship backed from the dock, she had a list to starboard of about 5 degrees; but as she proceeded on her voyage, the list shifted to the port side, and increased to between 10 and 14 degrees. Within a half hour of her departure, and while she was still in smooth water, the stanchions broke, first on the port side, then on the starboard; and the deck load above the rails spilled into the sea. The court concluded that faulty stowage of the deck load had rendered the ship topheavy and unseaworthy, and held that, since this was a breach of the duty to supervise loading which the charter party had placed on the captain, the ship was responsible for the loss.

The Court of Appeals accepted the District Court's finding that the ship was topheavy and unseaworthy because of improper loading, and its conclusion that this was a fault for which the master was responsible, but stated that the question was whether the charterer was also at fault. It pointed out that the cribbing was no part of the equipment which the vessel was under an obligation to furnish; that the charterer had erected it and chosen the material of which it was constructed; and that all the stanchions gave way at a time when the stress caused by the list of the ship was less than that which would be occasioned by the normal roll of the vessel at sea. These findings are supported by evidence.

Whether the court considered the topheaviness of the ship, caused by the faulty stowage, and the defective cribbing to be joint contributing causes of the loss, or thought the latter the proximate cause, is not clear. But

it reached the conclusion, without referring to any supporting facts, that the construction of the cribbing was a joint undertaking carried out by the charterer and the vessel, for the failure of which both were at fault, and decreed that the loss be divided.

As respondent did not ask certiorari, the only question we shall consider is whether the court below was wrong in denying the asserted liability of the ship for the entire loss. *Warner Co.* v. *Independent Pier Co.*, 278 U. S. 85, 91.

By the terms of the charter party there was an affirmative warranty of seaworthiness on the part of the vessel which would otherwise have been implied. *The Caledonia*, 157 U. S. 124, 130, 131. This warranty extends to unseaworthiness of the ship due to faulty stowage of cargo, *Corsar* v. *Spreckles*, 141 Fed. 260, even though the charterer himself, subject to supervision of the captain, loads the vessel, *The Seguranca*, 250 Fed. 19. The charterer is entitled to rely on the master, in the exercise of his expert knowledge and judgment, to control the disposal of cargo so as to avoid dangers to it from any consequent unseaworthiness of the vessel. *Olsen* v. *United States Shipping Co.*, *supra; The Oakley C. Curtis*, 4 F. (2d) 979; certiorari denied, 267 U. S. 599; *The Dana*, 190 Fed. 650; cf. *Corsar* v. *Spreckels*, *supra; The Thames*, 61 Fed. 1014.

Respondent argues that the responsibility of the ship, when loaded by the charterer, is limited to faulty stowage of cargo which endangers the ship, and that when the cargo alone is imperilled, as is contended was the case here, ensuing loss must be borne by the charterer. See *Elder & Dempster Co.* v. *Paterson, Zochonis & Co.*, (1924) A. C. 522, 560–562; *Reed & Co.* v. *Page, Son & East,* (1927) 1 K. B. 743, 754–756; cf. *The Oakley C. Curtis, supra*, p. 981.

We are not aware of any case in which the rule thus broadly stated has been applied so as to relieve the ship

from liability for damage to cargo exposed, by bad stowage, to sea perils peculiarly within the specialized knowledge and experience of the master. But it is unnecessary to pass on the question here for, independently of it, we think the ship cannot be held responsible for the loss imposed on petitioner by the decree below.

Whether or not the topheaviness of the Nidarholm be taken to have contributed to the loss, the collapse of the stanchions was also a contributing cause; and for the latter petitioner is responsible, at least to the extent of the one-half of the damage imposed on it below, unless there was a duty on the ship to guard against the defective construction of the cribbing.

The owner's duty to provide a seaworthy and cargoworthy ship at the beginning of the voyage did not extend to the defective cribbing. That warranty applies only to the ship and such equipment as is called for by the charter party. Cf. *The Santona,* 152 Fed. 516, 518. The cribbing was an enlargement of the ship's structural capacity for cargo beyond what she would otherwise naturally and reasonably take, which the vessel was not required to provide, and which was constructed by the charterer for its own convenience, to facilitate its stowage of cargo. The ship owed no duty to furnish the cribbing such as would relieve the charterer from the consequences of the failure to make it safe.

Even though the master's duty of supervision of cargo stowage might, for some purposes and under other circumstances, be deemed to extend to the erection of this structure as a means of stowing the deck load, still we think there was no duty of ship or master to prevent the charterer from loading the pulpwood in such manner as to expose it to dangers ordinarily incident to the transportation of a cargo on deck, and not peculiarly within the prevision of the master. See *Lawrence* v. *Minturn,* 17 How. 100, 115. The charterer knew, as well as the

master, that the ship would heel or roll at sea, and that the cribbing must be made sufficiently strong to hold the cargo on deck. We see no more reason for imposing responsibility on the ship for such an omission by the charterer than for the master's failure to prevent the charterer from stowing cargo in such manner that it is damaged by heat, *The Thomas P. Beal,* 11 F. (2d) 49; or in defective containers, *The Oakley C. Curtis, supra,* p. 982; or in such contact with other cargo that it suffers injury, cf. *Elder & Dempster Co.* v. *Paterson, Zochonis & Co., supra.* See also *Lawrence* v. *Minturn, supra.*

In the cases particularly relied upon by petitioner, the sole cause of the loss appears to have been the unseaworthiness of the ship. See *The Seguranca,* and *The Dana,* both *supra.* This was also the case with the part of the deck load of logs in *Olsen* v. *United States Shipping Co., supra,* jettisoned by the master to avoid danger to the ship, which, due to the excessive deck load, had listed 24 degrees, although no heavy weather had been encountered. Another part of the cargo of logs had been loaded by the charterer on the forward deck. As the loading was not completed until dark, the crew did not lash these logs, as they had those on the after deck. This part of the cargo spilled overboard when the master moved the ship without lashing the deck load. The court held the vessel liable, saying that she " . . . was unseaworthy as to her forward deck load, a thing which it was the duty of the master to prevent." But it did not appear that the charterer had assumed any duty of lashing the deck loads; and it is evident that the moving of the vessel before the logs were lashed, ready for the voyage, exposed them, by act of the master, to a peril within his knowledge and control. The case is thus distinguishable from the present, where the erection of the defective stanchions was the charterer's act, and where it does not appear that the defect was known to the master.

*Affirmed.*