**GEORGIA–PACIFIC CORPORATION, Plaintiff,**

v.

The **MOTORSHIP MARILYN L.,** her engines, etc., in rem, and Elvapores, Inc., her owners, Evans Products Company, her Charterer, and Retla Steamship Company, her operators, in personam, Defendants.

Civ. A. No. 161–69–N.

United States District Court,
E. D. Virginia,
Norfolk Division.

Sept. 27, 1971.

Jett, Sykes & Berkley, Norfolk, Va., for plaintiff.

Bernard G. Barrow, and Vandeventer, Black, Meredith & Martin, Norfolk, Va., for Evans Products Co. and Retla Steamship Co.

Richard I. Gulick, and Seawell, McCoy, Winston & Dalton, Norfolk, Va., for The Motorship MARILYN L., and Elvapores, Inc.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

The cargo owner, Georgia-Pacific Corporation, filed this action to recover damages sustained to cargo stowed in M/V MARILYN L, a vessel owned by Elvapores, Inc.,[1] and time-chartered to Evans Products Company (charterer), with the charterer's operating agent being Retla Steamship Company. In answers to interrogatories, Georgia-Pacific summarized its claim for loss and damage at $65,112.16, plus interest from the date of landing.

As the trial date approached the charterer effected a settlement with the cargo owner in the sum of $52,500.00, applying $29,655.55 from funds in escrow and leaving $6,509.75 in escrow to be credit-

---

1. This defendant was originally sued as *Evapores*, Inc. The file also reflects pleadings in the name of *Elmotores*, Inc. At the trial, counsel advised that the correct name of this defendant was Elvapores, Inc., and the pleadings are accordingly reformed.

ed toward the claim of Evans Products Company; the latter having also owned cargo which was damaged or lost aboard the vessel. The escrow fund was created by repackaging certain individual and broken sheets of lauan plywood, loaded at the ports of Inchon and Pusan, Korea, the total salvage being $36,365.31. All parties agree that the settlement was fair and reasonable, and that the apportionment of the escrow funds is likewise fair and reasonable. The issue of ultimate damage was reserved.

The charterer, having settled the claim of the cargo owner, now seeks reimbursement, in whole or in part, from the shipowner, Elvapores, Inc.

The charterer contends that the shipowner is responsible, in whole or in part, for the damage and loss of 191 crates of plywood consigned to Georgia-Pacific and 43 crates consigned to the charterer. During February 1969, at Inchon and Pusan, 667 crates consigned to Georgia-Pacific and 867 crates consigned to Evans Products Company were loaded aboard the vessel in apparent good order and condition. Upon discharge at San Diego, California, on March 18, 1969, the damage and loss to the respective consignees was discovered.[2] The damaged cargo was stowed in the No. 1 and No. 6 hatches of the vessel. The "missing cargo" was lost by reason of total destruction and, therefore, we treat the damage and loss in the same light.

The Charter Party between the charterer and shipowner provides the starting point in this controversy. While it is on a government form approved by the New York Produce Exchange, it contains several modifications and additional clauses. Interpreting various clauses of a charter party, especially when supplemented or modified, is admittedly a difficult task. As Judge Hand said in Farr v. Hain S. S. Co., 121 F.2d 940, 945 (2 Cir., 1941):

"Courts have again and again observed the curious, often the fantastic, incongruities in charter-parties, bills of lading and insurance policies, composed, as they so often are, of a motley patchwork of verbiage thrown together apparently at random, often in unfamiliar diction three hundred years old. Particularly in a document meant to do service in varying situations each word of such a discordant medley need not be made to count as we seek to make all the words count of carefully prepared contracts drawn for a particular occasion."

The clauses of the Charter Party to which we direct our attention are—

Clause 8 as modified by Clause 51(1):

That the Captain shall prosecute his voyages with the utmost despatch and shall render all customary assistance with the ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and the Charterers are to load, stow, trim and discharge the cargo at their expense."

(Note: The addendum eliminates the words "under the supervision of the Captain" following the word "expense.")

Clause 41 provides:

"Charterers are to load, stow, trim and discharge all cargoes in the way required by the Master for securing seaworthiness, safe trim and stress of the vessel when in port and when proceeding between ports and berths."

Clause 51(2) is interlocked with Clause 41 and specifies:

"The Master shall supervise the loading, stowing, trimming, and discharging of cargo only in the respects set forth in Clause 41 and in so doing he shall act on behalf of Owners."

Clause 51(3) proscribes:

"Owners shall have toward Charterers, with respect to cargo carried on board, all of the obligations and all of the exemptions from liability of a car-

---

2. The vessel then proceeded to Norfolk where additional plywood was discharged with substantial damage noted.

rier contained in Section 3(1), 3(6) and 4 of the Carriage of Goods by Sea Act of the United States approved April 16, 1936, and in Section 3(2) of said Act except as to loading, stowage and discharge of cargo and handling in the course thereof."

Finally, Clause 51(5) states:

"Charterers shall indemnify, hold harmless and defend Owners and the vessel against any and all loss, claims, demands, suits and expenses arising or resulting from damage to or loss of cargo. Owners shall reimburse Charterers for any and all damages and expenses, including legal fees, reasonably incurred by Charterers by virtue of this indemnity agreement when, and to the extent, said damages and expenses arise or result from breach by Owners of their obligation to Charterers under this Charter, including the obligation to furnish and maintain seaworthy winches, booms and other deck equipment * * *." (Note: As between the Owners and Charterers, the arbitration requirement under Clause 17 is rendered inapplicable in the remaining portion of Clause 51(5).)

Since the cargo owner is no longer a party to the action, we believe that the burden rests upon the Charterer, Evans Products Company, to establish by a fair preponderance of the evidence that the damage to the plywood was occasioned by a "breach by Owners [shipowner] of their obligations to Charterer under this Charter."

The basis of the charterer's claim against the shipowner rests upon three grounds. Initially it is stated that the ship's master breached the charter party by selecting a route and maneuvering his vessel in an improper manner. Then, too, inadequate shoring`was placed in the void spaces of the cargo when the ply-

wood was loaded in South Korea, during which time the vessel's captain, chief officer and others were aboard. Lastly, allied to some extent with the improper shoring, the charterer contends that the metacentric height of the vessel was such that the weight distribution should have been increased which could have been accomplished by additional ballasting.

The MARILYN L is a six-hatch bulk carrier of 14,800 gross tons, 550 feet, 6¼ inches in length, 75 feet in breadth, with a depth of 48 feet, 3¼ inches. This was the vessel's first voyage as a general cargo carrier as she had previously been used as a bulk cargo carrier. At all pertinent times, the officers and members of the crew were employed by Elvapores, Inc., the shipowner. After loading at Osaka, Japan, Inchon and Pusan, the vessel made a stop at Yokohama, Japan, departing March 3, 1969, and arriving at San Diego on March 18, 1969.

No significant damage was noted to the cargo in the holds of the vessel, other than the crates of plywood contained in the No. 1 and No. 6 holds.

■■ It was the responsibility of the charterer, Evans Products Company, to load and stow the cargo. Therein, claims the shipowner, lies the reason for the damaged cargo. The responsibility of the shipowner with respect to stowage of cargo is limited to the determination of seaworthiness,[3] safe trim or stress of the vessel. It is conceded that, as a result of the voyage, there was no damage to the vessel.

The innermost four hatches of the vessel are rectangular in shape with vertical sides. As noted, plywood stowed in these hatches was essentially undamaged. The first port of loading, not involving plywood, was at Osaka, Japan, where steel rods and wire were stowed in holds 2, 3, 4, 5 and 6. The next port of

---

3. The word "seaworthiness" as used in the Charter is not to be considered in the same light as used in personal injury or death actions involving crew members or longshoremen. The warranty of seaworthiness owed to a crew member or longshoreman carries with it a far greater obligation on the part of the shipowner. As used in the Charter, "seaworthiness" more accurately refers to the safety of the vessel.

call was Inchon, where the No. 1 hold was completely stowed with plywood, and small portions of plywood were also stowed in the bottoms of Nos. 2, 3 and 5, with a substantial quantity being placed in No. 6. At Pusan, the No. 6 hold was essentially filled with plywood, with large quantities likewise being placed in Nos. 2, 3, 4 and 5, and 39 crates being placed in No. 1, completely filling this hold. When the vessel arrived at Yokohama, automobiles were stowed in Nos. 2, 3, 4 and 5, all on top of the plywood. Both at Inchon and Pusan, the stowage of the plywood was under the direct supervision of the supervising stevedore employed by the charterer's agent, Retla Steamship Company.

During the voyage it was impossible to enter the No. 6 hold due to its capacity load as prepared by the stevedoring experts. The plywood was even with the lower level of the coaming. No. 1 was essentially full, but it could be entered. In holds 2, 3, 4 and 5, there was sufficient room to go down and walk between the cargo loads.

The No. 6 hatch did not have vertical sides because of the presence of fuel and ballast tanks protruding into the hold along with port and starboard upper wing tanks. It was necessary to construct a platform or scaffolding to permit the rectangular-shaped packages of plywood to be secured away from the sloping sides of the holds. Likewise, the crates of plywood had to be placed over the coils of wire which furnished no support for the weight of the plywood. The platform, constructed by the expert stevedores employed by the charterer's agent, was completed at Pusan after having been partially constructed in Osaka and Inchon. The ship's officer witnessed the loading at the various ports, but made no specific recommendations as he was primarily concerned with the safety of the ship and the cargo while at sea. He fully recognized that the expert stevedore had peculiar knowledge of the proper manner of

stowing plywood for a Pacific voyage in March. His final inspection of the stowage was limited to a vision of the top layer of cargo, although he did enter Nos. 2, 3, 4 and 5 where the automobiles were stowed.

The evidence as to inadequate stowage at Inchon and Pusan is overwhelming.[4] Upon arrival at San Diego, hatches 2, 3, 4 and 5 were entered through access trunkways, but the top hatches were not opened as no cargo was being off-loaded at this port. The Nos. 1 and 6 hatches were opened. The crates of plywood were approximately 8 feet by 4 feet, about 20 to 30 inches in height, and each containing 150 sheets. Upon opening the No. 6 hatch, it was readily observed that the crates were adrift; i. e., the packing, covering and bands were broken and the 150 sheets in each crate had moved in all directions. It resembled a loose deck of playing cards. In all, there were 198 crates, with 150 sheets in each crate, found in this condition in the No. 6 hatch at San Diego. There was no evidence of shoring found. In the area of the wing tanks there would have been void spaces in the customary loading of crated material which would require shoring. Indeed, the cargo surveyor, employed by charterer's agent, definitely stated that the stow was not proper in the No. 6 hatch at the time of the inception of the voyage.

Entering the No. 1 hold, the bow area is narrow in the front, becoming wider in the after ends, with a deep hatch coaming. As with No. 6, the crates had broken apart and the plywood sheets were adrift. Again, no evidence of shoring was present. Again, the marine surveyor stated that the stow was, in his opinion, improper at the commencement of the voyage.

Upon arrival at Norfolk the physical conditions discovered in the No. 6 hatch were essentially the same, other than that some of the cargo had been removed in San Diego. However, the testi-

4. The loading stevedore was not produced as a witness. The conclusions reached are from the deposition of the marine surveyor at San Diego and the testimony of a marine surveyor at Norfolk.

mony more vividly demonstrates the fault of the expert stevedore, at least as to the No. 6 hatch. There was a void space near the bottom of the hatch next to the coils of wire. Soft wood had been used in an attempt to bridge and cover the coils of wire and the empty space but, as clearly shown, the support was wholly insufficient to support the weight of the plywood crates. The coils of wire slid to the side and the support over the empty space and coils gave way. We agree with the marine surveyor at Norfolk who testified that the obviously inadequate stowage caused the cargo to commence settling at the inception of the voyage.[5] This is not to suggest that all damage occurred at the start of the voyage in Korea, but we think it clear that the trap was set so as to bring about further damage during any moderately rough sea voyage across the Pacific Ocean during March.

As to the No. 1 hatch, the major portion of the damage was to the plywood off-loaded at San Diego. The vessel, being a bulk carrier, did not have sweat battens or anything to protect the cargo with actual contact with the framing. Apparently no dunnage had been placed between the cargo and the framing. This caused the cargo to chafe against the shell frames of the ship. The cargo was not secured where it came out under the upper wing tanks in the No. 1 hold.

The fact that little or no damage to the plywood was found in hatches 2, 3, 4 and 5 cuts two ways. The charterer argues that the absence of material damage in these holds points to the weather damage caused by the selection of an improper route and, more significantly, by the change in metacentric height of the vessel during the voyage which was not corrected by ballasting as the fuel was consumed and the vessel rose higher in the water. The shipowner answers by saying that the innermost hatches were of a different shape than Nos. 1 and 6; the adequacy and sufficiency of the dunnage used in the innermost hatches would be more effective than in Nos. 1 and 6; there were no void spaces in the four innermost hatches, other than where the automobiles were stowed above the plywood; and if the route selected or metacentric height constituted a material factor in the damage to the plywood, it would have caused substantial damage to the plywood in hatches 2, 3, 4 and 5. As pointed out by the marine surveyor at San Diego, the damage in the area around the incline of the upper wing tanks was very extensive and, although damage was likewise sustained below these points, the condition of the crates improved somewhat. As to the No. 6 hatch, about one-half of the cargo was discharged at San Diego, with the balance being destined for Norfolk, Baltimore and Charleston. With respect to the No. 1 hatch, close to one-half was off-loaded at San Diego, with the balance discharged at Baltimore and Charleston. No evidence of shoring could be found in either hatch.

The expert at San Diego, employed by charterer's agent, Retla Steamship Company, attributes the damage to a combination of improper stowage and weather. He expresses the opinion that less damage would have been sustained had the vessel been exposed to less adverse conditions of sea, swell and wind. He also notes that a reduction in speed under adverse weather conditions would have decreased the damage. He makes no effort to apportion the degree of damage occasioned by the improper stowage or weather conditions.

The single question presented in this case is as follows: Where cargo is manifestly stowed improperly and inadequately, thus causing the cargo to shift in anticipated weather during the voyage, does the fact that adverse weather conditions may have aggravated or increased the extent of the cargo damage give rise to a case of divided damages? We answer this inquiry in the negative

---

5. The marine surveyor at San Diego likewise testified that the stowage was improper at the inception of the voyage in that it would not withstand the reasonable hazards of a voyage.

and, accordingly, find against the charterer, even though, as suggested herein, it is possible that following the recommended route, reducing the speed of the vessel, or ballasting to adjust the metacentric height may have aided in lessening the damage to the cargo.

## THE WEATHER CONDITIONS

All witnesses interrogated with respect to the same clearly state that the stowage of the vessel must be in accordance with the anticipated weather conditions on the contemplated voyage. This fundamental rule was flagrantly violated by the charterer's independent stevedoring contractors at Inchon and Pusan.

The evidence abundantly demonstrates that, during March, vessels crossing the Pacific may expect to encounter rough weather, including winds of Force 7, 8 and 9. A peril of the sea is one which, by reason of its irresistible force or overwhelming power, cannot be guarded against by the ordinary exertions of human skill and prudence. R. T. Jones Lumber Co. v. Roen Steamship Co., 270 F.2d 456, 458 (2 Cir., 1959).

In essence, the test is one of foreseeability. The record shows that, while rough weather was undoubtedly encountered throughout the voyage on the route selected by the master, the fact remains that it was not appreciably more than what could reasonably have been expected at that time of the year on this 5,000 mile voyage. The party charged with the responsibility of stowing the cargo is obliged to do so with knowledge of the anticipated adverse weather conditions. The pilot chart of the North Pacific Ocean demonstrates that frequent gales of *at least* Force 8 have been recorded in March.

It is quite true that the master of the vessel did not follow the recommended route as suggested by Pacific Weather Analysis, sometimes referred to as Oceanroutes. The master did not testify and his only explanation for deviating from the recommended route is contained in a letter, introduced by charterer, which states that he followed the recommended track until he encountered heavy weather and excess rolling from the starboard side, at which time he altered his course to bring the weather on the starboard quarter which, according to the master, permitted the vessel to navigate "better."

While we must find that the weather would have been less severe had the master followed the recommended route, all witnesses agree that it was not compulsory for the master to do so. Mariners acknowledge that the master is obliged to make navigational decisions which may result in the selection of a course which, after the voyage has ended, may prove to have been the unwise course. The master first altered his course on the third day out of Yokohama. From the sixth to tenth days out, he was too far north to return to the recommended route with safety to the ship and cargo. Moreover, in all probability, the damage to the cargo had been sustained during the first few days of the voyage by reason of the hopelessly inadequate shoring. It requires very little rolling or pitching of the vessel to cause cargo, in the manner stowed in this case, to shift and break apart, especially when there are void spaces into which the cargo will fall and settle the entire hatch. While we must conclude that the master would have met less adverse weather conditions by following the recommended route, it was nevertheless his privilege to select any route he thought best, and a mere error in judgment on this issue does not give rise to a divided damage application as applied to the facts of this case. If there was any evidence of proper stowage and shoring as to the Nos. 1 and 6 hatches, we might then have something to go on, as we could then possibly conclude that the error in judgment was properly attributed to the damage sustained.

## THE METACENTRIC HEIGHT

At the start of the voyage, as well as during the voyage, the lower ballast tanks were full, but the Nos. 1, 2 and 3 upper wing tanks and the fore and after peak tanks were empty. The vessel's metacentric height at the com-

mencement of the voyage was calculated at 10.8 feet, and this increased during the voyage to 11.28 feet due to consumption of fuel. This created some "stiffness" or "liveliness" to the vessel which caused the ship to return to an even keel more rapidly with a whipping motion. Undoubtedly this situation can be lessened by ballasting during the voyage, and this was not done.

It is argued that damage to the cargo was sustained by reason of the vessel reaching the upper metacentric height. Of course, this is possible but it would be dealing in pure speculation to suggest that *any* cargo was caused to shift and break apart from this alleged cause. Admittedly, there is no shred of evidence pointing to what proportion of the damage, if any, was occasioned thereby.

### SEAWORTHINESS OF VESSEL

As noted from the provisions of the Charter Party, the Carriage of Goods by Sea Act (COGSA), 46 U.S.C., §§ 1300–1315, is incorporated as a part and parcel thereof, subject only to the modification contained in the addendum, Clause 51 (5). Section 4 of the Act, 46 U.S.C., § 1304, provides, in part, as follows:

"(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 1303 of this title. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

"(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;

\* \* \* \* \* \*

"(c) Perils, dangers, and accidents of the sea or other navigable waters

\* \* \* \* \* \*

"(i) Act or omission of the shipper or owner of the goods, his agent or representative.

\* \* \* \* \* \*

"(q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage.

"(3) The shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising or resulting from any cause without the act, fault, or neglect of the shipper, his agents, or his servants.

"(4) Any deviation in saving or attempt to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom \* \* \*."

It is not disputed that the vessel was seaworthy at the inception of the voyage. As stated in The Framlington Court, 69 F.2d 300, 304 (5 Cir., 1934):

"Seaworthiness is a relative term depending for its application upon the type of vessel and the character of the voyage. The general rule is that the ship must be staunch and strong and well equipped for the intended voyage. And she must also be provided with a crew, adequate in number and competent for the voyage with reference to its length and other particulars, and

have a competent and skillful master of sound judgment and discretion."

The vessel was staunch and strong. There is no claim that it was not well equipped. The crew was adequate in numbers. The crew and master were, without regard to the failure to follow the recommended route and filling the tanks with ballast, competent and skilled. If the master was competent and skilled, the purported deviation from the recommended route cannot be deemed an infringement of the charter under 46 U.S.C., § 1304(4); nor can the shipowner be held liable for the alleged failure to adjust the metacentric height of the vessel during the course of the voyage under 46 U.S.C., § 1304(2) (a). The master must be left some discretion in determining questions of reasonable deviation, the weight distribution of a vessel, and the speed of the ship. Assuming arguendo that the master was negligent in the exercise of due diligence —a finding that is not herein made—the shipowner would not be liable. President of India By and Through Director of India Supply Mission v. West Coast Steamship Company, 213 F.Supp. 352 (D.C.Ore., 1962), affirmed per curiam, 327 F.2d 638 (9 Cir., 1964), cert. denied 377 U.S. 924, 84 S.Ct. 1222, 12 L.Ed.2d 216 (1964).

Attention has been directed to Horn v. Cia de Navegacion Fruco, S.A., 404 F. 2d 422 (5 Cir., 1968), cert. denied 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969). The distinguishing features of that case are that, as to one voyage, the bananas were improperly stowed "under the supervision of the Captain" and, as to the other voyage, the shipowner failed to use due diligence in caring for the proper ventilation and refrigeration of the cargo of bananas. In the instant case, we have no problem of ventilation and refrigeration. We are, however, confronted with the interpretation of the words "under the supervision of the Captain" as applied to the charter. It is significant that Clause 8, as modified by Clause 51(1), imposes upon the charterer the duty to "load, stow, trim and dis-charge the cargo at their expense," and the usual language following same; i. e., "under the supervision of the Captain" was deleted. Clauses 41 and 51(2) manifestly imply that the captain is not to interfere with the loading, stowing, trimming and discharging of cargo except for the purpose of securing seaworthiness, safe trim and stress of the vessel. We conclude that, under the charter, the chief officer, acting for the master, was under no duty of determining the shoring (or lack of same) in hatches Nos. 1 and 6. He had a right to assume that the expert stevedore, employed by charterer's agent, would stow the cargo in a manner designed to withstand the normal perils of the sea during a Pacific crossing in March.

In Oxford Paper Company v. The Nidarholm, 282 U.S. 681, 51 S.Ct. 266, 75 L.Ed. 614 (1931), the Supreme Court discussed the obligations of the charterer and shipowner under the customary charter party calling upon the charterer to "load, stow, and trim the cargo at their expense *under the supervision of the captain*"—the italicized words not being included in the present controversy. In *Oxford,* pulpwood had been loaded on the deck of the vessel by the charterer, thus making the vessel topheavy and unseaworthy, and thereafter, while the vessel was in smooth water, the stanchions erected by the charterer collapsed with the resultant loss of cargo. The Supreme Court, recognizing the obligation of the master to supervise the loading of the vessel under that charter party, divided the damages as there was evidence of the unseaworthiness of the vessel occasioned by the act of the charterer in loading "under the supervision of the captain." Here, however, the master, according to the terms of the charter party, assumed no obligation of loading and did not supervise same at all. All loading responsibility rested with the charterer without interference by the master *except* that the captain could have *required* the charterer to alter its loading process "for securing seaworthiness, safe trim and stress of the vessel."

In this case the master did not "require" any alteration or modification, nor was he compelled to do so as far as the cargo was concerned. Under the facts of this case the charterer must stand the entire loss in accordance with the charter party. While the *warranty* of seaworthiness extends to faulty stowage of cargo, as Mr. Justice Stone stated in *Oxford*, this does not mean that, as between the charterer and shipowner, the responsibility for the improper stowage of cargo cannot rest *solely* upon the charterer.[6] That is the situation presented here.

Finding that, under the evidence presented, the shipowner is not liable to the charterer or its agent, an appropriate decree may be presented in accordance with this memorandum.

6. An interesting discussion of this subject will be found in 43 Tulane Law Review 484–490, entitled "The P & I Policy," which substantially supports the views herein expressed.