FERNALES SHIPPING COMPANY, S.A., Plaintiff-Appellant Cross-Appellee,

v.

BONAIRE PETROLEUM CORPORATION, Defendant-Appellee Cross-Appellant.

No. 82–3594.

United States Court of Appeals, Fifth Circuit.

June 4, 1984.

trict court's treatment of the NEPA issue on the merits, we need not address the timeliness issue.

Torres & Bischof, Kenneth B. Krobert, Chalmette, La., for plaintiff-appellant, cross-appellee.

Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, J.Y. Gilmore, Jr., New Orleans, La., for defendant-appellee cross-appellant.

Before BROWN, THORNBERRY and TATE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This is a case based on a voyage charter that fell through when delays caused the shipper to obtain another vessel to carry its cargo. The shipowner appeals from the denial of its claim for charter hire, and the shipper cross-appeals from the denial of its claim for additional costs incurred in obtaining an alternative charter. Because we agree with the District Court that both parties contributed to the delay and caused the failure of their agreement, we affirm the judgment that neither party should recover.

In October, 1980, Bonaire Petroleum (Shipper) entered into a contract with Raymond Fabricators of Morgan City, Louisiana, to fabricate three large steel pilings measuring approximately 156 feet long and 59 inches in diameter. The pilings were intended for use by Shipper to repair a damaged breasting dolphin at Shipper's facility on the island of Bonaire, in the Caribbean.

In early December, 1980, Shipper and Fernales Shipping Company (Carrier) agreed to a voyage charter of the ANK WINSEMIUS for carriage of the three pilings from Morgan City to Curacao, Netherland Antilles. A common form of printed

charter (GENCON) was used. The charter hire of $110,000 included the cost of loading and discharge of the pilings. It was contemplated that Raymond, who was building the pilings for Shipper, would use its cranes to load the pilings at the expense of Carrier.

The charter originally required the ship to arrive for loading between February 1 and February 15, 1981, and stated that time was of the essence. Later, Carrier requested and was granted an extension of the arrival interval to between February 15 and February 25.

From the beginning of their agreement in December, 1980, both Carrier and Shipper knew that steel cradles for the pilings would have to be built in order to ship them securely on the deck of the vessel. However, the parties neglected to decide upon, or even discuss, who would make arrangements for the construction of the cradles. Apparently, both Shipper and Carrier assumed that the other was to make the arrangements for construction of the cradles. Raymond was to construct and to load the pilings. However, Landry, Raymond's supervisor, had been told nothing about the need for cradles until February 11, when Carrier inquired of him whether the cradles had been fabricated yet. Landry said they had not, but that he could make the cradles if he had plans of the vessel. Raymond needed about three days to construct the cradles and load the pilings. It would take about another week for the vessel to reach Curacao. Carrier did not get the vessel plans to Raymond until February 23 (12 days delay).

Also on February 23, Carrier by telex requested an extension of the last arrival date from February 23 to February 27 with a guarantee of arrival in Curacao by March 7. Shipper, by telex, granted the extension, but exacted a penalty of $16,800 for every day beyond the March 7 deadline for arrival. No one seems to question that this exchange modified the contract.

On February 25, the ship arrived and was ready to load. However, when the Carrier's representative arrived the next day, he was told by Raymond that cradles could not be constructed until Raymond had architectural plans for the cradles. Carrier then hired a New Orleans naval architect to draw plans. They were not ready until a week later. When Raymond finally got the plans on March 6, shipper had already decided to cancel the contract and had told Raymond not to build the cradles. Raymond obeyed these instructions because Shipper earlier had guaranteed payment to Raymond for the construction of the cradles. Shipper had begun negotiations for an alternative carrier at that time, and eventually shipped the pilings for a fee of $132,000. The pilings reached Curacao about three weeks later than they would have if Shipper had not cancelled the charter with Carrier.

Carrier sued for the agreed charter hire. Shipper counterclaimed for the cost of the alternative carriage contract. The District Court found that both parties had been aware of the need for cradles since December, 1980, and yet had not agreed, either explicitly or implicitly, on who would be responsible for *arranging for* (as opposed to *paying for*) the construction of the cradles. The Court also found, and the parties agreed, that the printed charter did not speak to this issue. Finding some fault on the part of both Carrier and Shipper, the District Court denied the claims of each.

■ At the outset, it is important to recognize that parties to a private contract of carriage such as the charter party in this case [1] are not subject to the rigid legal regime imposed by law on common carriers by water under the Harter Act, 46 U.S.C. §§ 190–94, and the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–15. Where no bill of lading is issued for the cargo, the parties to a charter party enjoy freedom of contract to allocate between themselves responsibilities for loading and stowing the

1. For a discussion of the distinction between common and private carriage, see *United States v. Stephen Brothers Line,* 384 F.2d 118 (5th Cir. 1967); *Close v. Anderson,* 1978 A.M.C. 959 (W.D. Wash.).

cargo and any necessary preparations. Anderson, *Time and Voyage Charters: Proceeding to Loading Port, Loading, and Related Problems*, 49 Tul.L.Rev. 880, 892 (1975). *See Oxford Paper Co. v. The Nidarholm*, 282 U.S. 681, 51 S.Ct. 266, 75 L.Ed. 614 (1931); *Mississippi Valley Barge Line Co. v. Inland Waterways Shippers Ass'n.*, 289 F.2d 374, 378 (8th Cir.1961). The main issue in this case—who was responsible for making the arrangements for the cradles—is thus a question of what the parties agreed or mutually intended. The parties conceded, and the District Court found, that the printed and written charter party did not refer, either expressly or impliedly, to the issue of what the parties intended regarding the cradles. The District Court also found that there was no oral agreement allocating this responsibility. Because the parties clearly intended to bind themselves to a contract, the District Court analyzed the parties' respective rights of recovery according to how they conducted themselves in the belated attempt to remedy this mutual omission. Under the circumstances of this case, this was proper.[2]

### The Shipper's Counterclaim

The trial court correctly denied Shipper's claim for the cost of shipment by way of another carrier's vessel. This cost resulted from Shipper's decision to cancel the charter party with Carrier. Shipper contends that it had the right to cancel for three reasons: (1) the vessel was unseaworthy, because it was not fit to carry the cargo contemplated in the charter, (2) the delay frustrated the purpose of the charter, and (3) the charter gave Shipper the right to cancel. There is no merit in any of these contentions.

■ Failure of the vessel to arrive with cradles specially designed and built to fit the cargo did not render the vessel unseaworthy. In *Oxford Paper Co. v. The Nidarholm*, 282 U.S. 681, 51 S.Ct. 266, 75 L.Ed. 614 (1931), the Supreme Court held that in a private contract of carriage the "owner's duty to provide a seaworthy and cargo-worthy ship at the beginning of the voyage did not extend to ... cribbing. That warranty applies only to the ship and such equipment as is called for by the charter party." *Id.* at 685, 51 S.Ct. at 268. In this case, the charter party did not call for Carrier to provide the cradles. The District Court found as a fact that the parties had failed to allocate this responsibility by agreement, as they were free to do. There is no contention that the vessel would not have been fit to carry the cargo once the cradles were installed if Shipper had not cancelled three days before the cradles would have been built. Thus, the vessel was not unseaworthy.

**2.** After reaching a decision on the Carrier's claim based on its own tardiness, and a decision on the Shipper's counterclaim based on its own self-defeating cancellation, the District Court nevertheless went on in dictum to declare that, in the absence of agreement, the Carrier bears the responsibility for arranging unusual preparations for a particular cargo. The Court reasoned:

> Given that the vessel and not the shipper had information about the design of the vessel, the contours of the deck, the strength of the vessel members, etc., absent any agreement to the contrary, the obligation to arrange for the cradles was the vessel's.

We emphasize that our affirmance does not include this statement. Declaration of an abstract rule of law as to the responsibility for making arrangements for extraordinary preparations is hardly appropriate. Because these preparations require the accommodation of the peculiar structure of the vessel to the peculiar structure of the cargo, it is, in the absence of agreement, necessarily a joint undertaking in an operational sense. The information needed to make the arrangements, contrary to the suggestion of the District Court, is not all in the hands of the vessel. Neither party can make arrangements until he has the specifications of both the cargo and the vessel. Where private carriage is concerned, delegation of the task of making arrangements necessarily has to be by agreement on a case-by-case basis. Where, as here, the parties have failed to make arrangements or to delegate that task, they have to bear the responsibility. No matter how wide the equitable powers of the admiralty, *see Compania Anonima Venezolana De Navegacion v. A.J. Perez Export Company*, 303 F.2d 692, 699 (5th Cir.), *cert. denied*, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (1962), 1962 A.M.C. 1710, the Court is not required to find an intent where none exists.

Shipper's contention that cancellation of the charter was justified because Carrier's delay in preparing the cradles frustrated the purpose of the contract is untenable. As the Court found, the cancellation itself caused an *additional* three weeks delay in the arrival of the cargo, creating a greater frustration of the purpose of carriage without undue delay. Thus, the cancellation was not justified under a frustration of purpose theory.

The provisions of the charter party also did not give the Shipper a right of cancellation. Shipper points to a small-print clause on the back of the charter providing that Shipper may cancel if the carrier was ten days late in loading. However, the trial court properly ruled that this printed provision had been supplanted by the telex exchange in which the parties agreed that Carrier would have the cargo in Curacao on March 7, and if he did not, there would be a penalty of $16,800 per day. The Court found, and we agree, that this delay penalty was intended to apply to all delays, whether in loading or in arriving at the destination. Accordingly, because Shipper had no right to cancel the charter, but only to offset the delay penalty, Shipper cannot recover for its expenses arising from the substitute shipping arrangements.

### Carrier's Claim for Charter Hire

The District Court held that Carrier's claim for charter hire was offset by delay penalties. The Court found that, despite the earlier failure of both parties to attend to the arrangements for the cradles or to allocate that responsibility, the cargo still could have been delivered by the March 7 deadline if the Carrier had not caused unreasonable delay in producing the ship's plans and architectural drawings when it became aware that such materials were needed and that time was short. Because we are in substantial agreement with District Court's reasoning on this point, we adopt its discussion:

> We assume *arguendo* (obviously the more favorable Fernales position) that initially the obligation to arrange for the cradles was Bonaire's. As of February 12 (plaintiff exhibit 29), Fernales was aware that no arrangements had been made for the cradles and that at the very least ship plans were necessary for Raymond even to consider whether it would undertake the fabrication of the cradles. The critical loading date for the cargo to be delivered to its destination on March 7 was approximately February 28. There was still ample time after February 12 for the ship plans to be sent to Raymond, for the detailed cradle drawings to be prepared thereafter, and for the cradles to be fabricated and installed, all prior to February 28. To analyze it differently, Mr. Verkooy of Fernales knew on February 12 that Raymond needed the ship plans. Had they been sent promptly, certainly not later than February 15 he would have been in a position to inquire whether Raymond was ready to proceed with the work. Had he done so, he would have been told that architectural drawings were necessary. Prompt attention to this would have produced the drawings within several days, surely not later than February 20. Only three days were necessary to complete the fabrication and installation of the cradles. Thus there was ample time, with four or five extra days, for all of this to be accomplished between February 12 and February 28. The architectural plans were not actually delivered to Raymond until March 6.
>
> Prompt attention to these matters, was the only prudent approach, considering that the charter had already been delayed at the request of Fernales, and especially considering the $16,800.00 daily penalty. Regardless of who had the obligation initially to arrange for the cradles, it is clear that all of the unnecessary delay is attributable to Fernales, the only party which could produce the ship plans and which undertook to produce detailed architectural plans.
>
> Although there is an apparent inconsistency in the District Court's assuming that Shipper bore the responsibility for making

the arrangements and then penalizing Carrier for not having made those arrangements swiftly at the eleventh hour, we can uphold this analysis by adding our own legal analysis to its factual findings.

██ We need not assume that the responsibility for making the arrangements was entirely on Shipper, because Carrier shared the responsibility with Shipper for failing to allocate this responsibility and thus for causing the inaction on cradle preparation from December 10, 1980 to February 11, 1981. This inaction by Carrier causing the early delays, combined with Carrier's requests for extensions in the loading date, which requests gave rise to the delay penalty agreement, imposed on Carrier the duty to cooperate with reasonable speed in the eleventh hour arrangements for cradles. The District Court found as a fact that Carrier's late actions in providing ship plans and architectural drawings were unreasonably slow under the circumstances, and that the delay penalty deadline of March 7 would have been met if not for this slowness. We find no clear error in these factual conclusions. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). Thus, we agree with the District Court's conclusion that Carrier is responsible for the delay penalty of $16,800 per day for eight days that would have accrued if the shipment had been made on the ANK.

Although we have followed the District Court's approach of analyzing separately the claim of Carrier and the counterclaim of Shipper, we have been influenced by the overall circumstances. Both parties were at fault and contributed to the failure of their contract to be satisfactorily executed, and both parties have suffered roughly equivalent losses. Under these circumstances, we agree with the District Court that neither should recover from the other.

"The Chancellor ... may stride the quarterdeck of maritime jurisprudence and, in the role of admiralty judge, dispense ... that which equity and good conscience impels." *Compania Anonima Venezolana De Navegacion v. A.J. Perez Export Co.*, 303 F.2d 692, 699 (5th Cir.1962), 1962 A.M.C. 1710. That equitable power encompasses the trial court's apt use of Solomonic wisdom.

AFFIRMED.